Justice Scalia
delivered the opinion of the Court.
We consider whether a break in custody ends the presumption of involuntariness established in Edwards v. Arizona, 451 U. S. 477 (1981).
I
In August 2003, a social worker assigned to the Child Advocacy Center in the Criminal Investigation Division of the Hagerstown Police Department referred to the department allegations that respondent Michael Shatzer, Sr., had sexually abused his 3-year-old son. At that time, Shatzer was *101 incarcerated at the Maryland Correctional InstitutionHagerstown, serving a sentence for an unrelated child-sexual-abuse offense. Detective Shane Blankenship was assigned to the investigation and interviewed Shatzer at the correctional institution on August 7, 2003. Before asking any questions, Blankenship reviewed Shatzer’s Miranda rights with him, and obtained a written waiver of those rights. When Blankenship explained that he was there to question Shatzer about sexually abusing his son, Shatzer expressed confusion — he had thought Blankenship was an attorney there to discuss the prior crime for which he was incarcerated. Blankenship clarified the purpose of his visit, and Shatzer declined to speak without an attorney. Accordingly, Blankenship ended the interview, and Shatzer was released back into the general prison population. Shortly thereafter, Blankenship closed the investigation.
Two years and six months later, the same social worker referred more specific allegations to the department about the same incident involving Shatzer. Detective Paul Hoover, from the same division, was assigned to the investigation. He and the social worker interviewed the victim, then eight years old, who described the incident in more detail. With this new information in hand, on March 2, 2006, they went to the Roxbury Correctional Institute, to which Shatzer had since been transferred, and interviewed Shatzer in a maintenance room outfitted with a desk and three chairs. Hoover explained that he wanted to ask Shatzer about the alleged incident involving Shatzer’s son. Shatzer was surprised because he thought that the investigation had been closed, but Hoover explained they had opened a new file. Hoover then read Shatzer his Miranda rights and obtained a written waiver on a standard department form.
Hoover interrogated Shatzer about the incident for approximately 30 minutes. Shatzer denied ordering his son to perform fellatio on him, but admitted to masturbating in *102 front of his son from a distance of less than three feet. Before the interview ended, Shatzer agreed to Hoover’s request that he submit to a polygraph examination. At no point during the interrogation did Shatzer request to speak with an attorney or refer to his prior refusal to answer questions without one.
Five days later, on March 7, 2006, Hoover and another detective met with Shatzer at the correctional facility to administer the polygraph examination. After reading Shatzer his Miranda rights and obtaining a written waiver, the other detective administered the test and concluded that Shatzer had failed. When the detectives then questioned Shatzer, he became upset, started to cry, and incriminated himself by saying, “ ¶ didn’t force him. I didn’t force him.’ ” 405 Md. 585, 590, 954 A. 2d 1118,1121 (2008). After making this inculpatory statement, Shatzer requested an attorney, and Hoover promptly ended the interrogation.
The State’s Attorney for Washington County charged Shatzer with second-degree sexual offense, sexual child abuse, second-degree assault, and contributing to conditions rendering a child in need of assistance. Shatzer moved to suppress his March 2006 statements pursuant to Edwards. The trial court held a suppression hearing and later denied Shatzer’s motion. The Edwards protections did not apply, it reasoned, because Shatzer had experienced a break in custody for Miranda purposes between the 2003 and 2006 interrogations. No. 21-K-06-37799 (Cir. Ct. Washington Cty., Md., Sept. 14, 2006), App. 55. Shatzer pleaded not guilty, waived his right to a jury trial, and proceeded to a bench trial based on an agreed statement of facts. In accordance with the agreement, the State described the interview with the victim and Shatzer’s 2006 statements to the detectives. Based on the proffered testimony of the victim and the “admission of the defendant as to the act of masturbation,” the trial court found Shatzer guilty of sexual child abuse of his *103 son.[1] No. 21-K-06-37799 (Cir. Ct. Washington Cty., Md., Sept. 21, 2006), id., at 70, 79.
Over the dissent of two judges, the Court of Appeals of Maryland reversed and remanded. The court held that “the passage of time alone is insufficient to [end] the protections afforded by Edwards,” and that, assuming, arguendo, a break-in-custody exception to Edwards existed, Shatzer’s release back into the general prison population between interrogations did not constitute a break in custody. 405 Md., at 606-607,954 A. 2d, at 1131. We granted certiorari, 555 U. S. 1152 (2009).
II
The Fifth Amendment, which applies to the States by virtue of the Fourteenth Amendment, Malloy v. Hogan, 378 U. S. 1, 6 (1964), provides that “[n]o person ... shall be compelled in any criminal case to be a witness against himself.” U. S. Const., Arndt. 5. In Miranda v. Arizona, 384 U. S. 436 (1966), the Court adopted a set of prophylactic measures to protect a suspect’s Fifth Amendment right from the “inherently compelling pressures” of custodial interrogation. Id., at 467. The Court observed that “incommunicado interrogation” in an “unfamiliar,” “police-dominated atmosphere,” id., at 456-457, involves psychological pressures “which work to undermine the individual’s will to resist and to compel him to speak where he would not otherwise do so freely,” id., at 467. Consequently, it reasoned, “[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice.” Id., at 458.
To counteract the coercive pressure, Miranda announced that police officers must warn a suspect prior to questioning *104 that he has a right to remain silent, and a right to the presence of an attorney. Id., at 444. After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease. Id., at 473-474. Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present. Id., at 474. Critically, however, a suspect can waive these rights. Id., at 475. To establish a valid waiver, the State must show that the waiver was knowing, intelligent, and voluntary under the “high standard] of proof for the waiver of constitutional rights [set forth in] Johnson v. Zerbst, 304 U. S. 458 (1938).” Id., at 475.
In Edwards, the Court determined that Zerbsfs traditional standard for waiver was not sufficient to protect a suspect’s right to have counsel present at a subsequent interrogation if he had previously requested counsel; “additional safeguards” were necessary. 451 U. S., at 484. The Court therefore superimposed a “second layer of prophylaxis,” McNeil v. Wisconsin, 501 U. S. 171, 176 (1991). Edwards held:
“[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [He] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.” 451 U. S., at 484-485.
The rationale of Edwards is that once a suspect indicates that “he is not capable of undergoing [custodial] questioning without advice of counsel,” “any subsequent waiver that has come at the authorities’ behest, and not at the suspect’s own instigation, is itself the product of the ‘inherently compelling *105 pressures’ and not the purely voluntary choice of the suspect.” Arizona v. Roberson, 486 U. S. 675, 681 (1988). Under this rule, a voluntary Miranda waiver is sufficient at the time of an initial attempted interrogation to protect a suspect’s right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel. The implicit assumption, of course, is that the subsequent requests for interrogation pose a significantly greater risk of coercion. That increased risk results not only from the police’s persistence in trying to get the suspect to talk, but also from the continued pressure that begins when the individual is taken into custody as a suspect and sought to be interrogated — pressure likely to “increase as custody is prolonged,” Minnick v. Mississippi, 498 U. S. 146, 153 (1990). The Edwards presumption of involuntariness ensures that police will not take advantage of the mounting coercive pressures of “prolonged police custody,” Roberson, 486 U. S., at 686, by repeatedly attempting to question a suspect who previously requested counsel until the suspect is “badgered into submission,” id., at 690 (Kennedy, J., dissenting).
We have frequently emphasized that the Edwards rule is not a constitutional mandate, but judicially prescribed prophylaxis. See, e. g., Montejo v. Louisiana, 556 U. S. 778, 787 (2009); Michigan v. Harvey, 494 U. S. 344, 349 (1990); Solem v. Stumes, 465 U. S. 638, 644, n. 4 (1984). Because Edwards is “our rule, not a constitutional command,” “it is our obligation to justify its expansion.” Roberson, supra, at 688 (Kennedy, J., dissenting). Lower courts have uniformly held that a break in custody ends the Edwards presumption, see, e. g., People v. Storm, 28 Cal. 4th 1007, 1023-1024, and n. 6, 52 P. 3d 52, 61-62, and n. 6 (2002) (collecting state and federal cases), but we have previously addressed the issue only in dicta, see McNeil, supra, at 177 (Edwards applies “assuming there has been no break in custody”).
*106 A judicially crafted rule is “justified only by reference to its prophylactic purpose,” Davis v. United States, 512 U. S. 452, 458 (1994) (internal quotation marks omitted), and applies only where its benefits outweigh its costs, Montejo, supra, at 793. We begin with the benefits. Edwards’ presumption of involuntariness has the incidental effect of “conserving] judicial resources which would otherwise be expended in making difficult determinations of voluntariness.” Minnick, supra, at 151. Its fundamental purpose, however, is to “[p]reserv[e] the integrity of an accused’s choice to communicate with police only through counsel,” Patterson v. Illinois, 487 U. S. 285, 291 (1988), by “preventing] police from badgering a defendant into waiving his previously asserted Miranda rights,” Harvey, supra, at 350. Thus, the benefits of the rule are measured by the number of coerced confessions it suppresses that otherwise would have been admitted. See Montejo, supra, at 793.
It is easy to believe that a suspect may be coerced or badgered into abandoning his earlier refusal to be questioned without counsel in the paradigm Edwards case. That is a ease in which the suspect has been arrested for a particular crime and is held in uninterrupted pretrial custody while that crime is being actively investigated. After the initial interrogation, and up to and including the second one, he remains cut off from his normal life and companions, “thrust into” and isolated in an “unfamiliar,” “police-dominated atmosphere,” Miranda, 384 U. S., at 456-457, where his captors “appear to control [his] fate,” Illinois v. Perkins, 496 U. S. 292, 297 (1990). That was the situation confronted by the suspects in Edwards, Roberson, and Minnick, the three cases in which we have held the Edwards rule applicable. Edwards was arrested pursuant to a warrant and taken to a police station, where he was interrogated until he requested counsel. Edwards, 451 U. S., at 478-479. The officer ended *107 the interrogation and took him to the county jail[2] but at 9:15 the next morning, two of the officer’s colleagues reinterrogated Edwards at the jail. Id., at 479. Roberson was arrested “at the scene of a just-completed burglary” and interrogated there until he requested a lawyer. Roberson, 486 U. S., at 678. A different officer interrogated him three days later while he “was still in custody pursuant to the arrest.” Ibid. Minnick was arrested by local police and taken to the San Diego jail, where two Federal Bureau of Investigation agents interrogated him the next morning until he requested counsel. Minnick, 498 U. S., at 148-149. Two days later a Mississippi deputy sheriff reinterrogated him at the jail. Id., at 149. None of these suspects regained a sense of control or normalcy after they were initially taken into custody for the crime under investigation.
When, unlike what happened in these three cases, a suspect has been released from his pretrial custody and has returned to his normal life for some time before the later attempted interrogation, there is little reason to think that his change of heart regarding interrogation without counsel has been coerced. He has no longer been isolated. He has likely been able to seek advice from an attorney, family members, and friends.[3] And he knows from his earlier experience that he need only demand counsel to bring the interro *108 gation to a halt; and that investigative custody does not last indefinitely. In these circumstances, it is farfetched to think that a police officer’s asking the suspect whether he would like to waive his Miranda rights will any more “wear down the accused,” Smith v. Illinois, 469 U. S. 91, 98 (1984) (per curiam), than did the first such request at the original attempted interrogation — which is of course not deemed coercive. His change of heart is less likely attributable to “badgering” than it is to the fact that further deliberation in familiar surroundings has caused him to believe (rightly or wrongly) that cooperating with the investigation is in his interest. Uncritical extension of Edwards to this situation would not significantly increase the number of genuinely coerced confessions excluded. The “justification for a conclusive presumption disappears when application of the presumption will not reach the correct result most of the time.” Coleman v. Thompson, 501 U. S. 722, 737 (1991).
At the same time that extending the Edwards rule yields diminished benefits, extending the rule also increases its costs: the in-fact voluntary confessions it excludes from trial, and the voluntary confessions it deters law enforcement officers from even trying to obtain. Voluntary confessions are not merely “a proper element in law enforcement,” Miranda, supra, at 478, they are an “unmitigated good,” McNeil, 501 U. S., at 181, “ ‘essential to society’s compelling interest in finding, convicting, and punishing those who violate the law,’ ” ibid, (quoting Moran v. Burbine, 475 U. S. 412, 426 (1986)).
The only logical endpoint of Edwards disability is termination of Miranda custody and any of its lingering effects. Without that limitation — -and barring some purely arbitrary time limit[4] — every Edwards prohibition of custodial interro *109 gation of a particular suspect would be eternal. The prohibition applies, of course, when the subsequent interrogation pertains to a different crime, Roberson, supra, when it is conducted by a different law enforcement authority, Min-nick, 498 U. S. 146, and even when the suspect has met with an attorney after the first interrogation, ibid. And it not only prevents questioning ex ante; it would render invalid, ex post, confessions invited and obtained from suspects who (unbeknownst to the interrogators) have acquired Edwards immunity previously in connection with any offense in any jurisdiction.[5] In a country that harbors a large number of repeat offenders,[6] this consequence is disastrous.
We conclude that such an extension of Edwards is not justified; we have opened its “'protective umbrella/” Solem, 465 U. S., at 644, n. 4, far enough. The protections offered by Miranda, which we have deemed sufficient to ensure that the police respect the suspect’s desire to have an attorney present the first time police interrogate him, adequately ensure that result when a suspect who initially requested counsel is reinterrogated after a break in custody that is of sufficient duration to dissipate its coercive effects.
*110 If Shatzer’s return to the general prison population qualified as a break in custody (a question we address in Part III, infra), there is no doubt that it lasted long enough (two years) to meet that durational requirement. But what about a break that has lasted only one year? Or only one week? It is impractical to leave the answer to that question for clarification in future ease-by-case adjudication;.law enforcement officers need to know, with certainty and beforehand, when renewed interrogation is lawful. And while it is certainly unusual for this Court to set forth precise time limits governing police action, it is not unheard of. In County of Riverside v. McLaughlin, 500 U. S. 44 (1991), we specified 48 hours as the time within which the police must comply with the requirement of Gerstein v. Pugh, 420 U. S. 103 (1975), that a person arrested without a warrant be brought before a magistrate to establish probable cause for continued detention.
Like McLaughlin, this is a case in which the requisite police action (there, presentation to a magistrate; here, abstention from further interrogation) has not been prescribed by statute but has been established by opinion of this Court. We think it appropriate to specify a period of time to avoid the consequence that continuation of the Edwards presumption “will not reach the correct result most of the time.” Coleman, supra, at 737. It seems to us that period is 14 days. That provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody.
The 14-day limitation meets Shatzer’s concern that a break-in-custody rule lends itself to police abuse. He envisions that once a suspect invokes his Miranda right to counsel, the police will release the suspect briefly (to end the Edwards presumption) and then promptly bring him back into custody for reinterrogation. But once the suspect has been out of custody long enough (14 days) to eliminate its *111 coercive effect, there will be nothing to gain by such gamesmanship — nothing, that is, except the entirely appropriate gain of being able to interrogate a suspect who has made a valid waiver of his Miranda rights.[7]
Shatzer argues that ending the Edwards protections at a break in custody will undermine Edwards’ purpose to conserve judicial resources. To be sure, we have said that “[t]he merit of the Edwards decision lies in the clarity of its command and the certainty of its application.” Minnick, 498 U. S., at 151. But clarity and certainty are not goals in themselves. They are valuable only when they reasonably further the achievement of some substantive end — here, the exclusion of compelled confessions. Confessions obtained after a 2-week break in custody and a waiver of Miranda rights are most unlikely to be compelled, and hence are unreasonably excluded. In any case, a break-in-custody exception will dim only marginally, if at all, the bright-line nature of Edwards. In every case involving Edwards, the courts must determine whether the suspect was in custody when he requested counsel and when he later made the statements he seeks to suppress. Now, in cases where there is an alleged break in custody, they simply have to repeat the inquiry for the time between the initial invocation and reinterrogation. In most cases that determination will be easy. And when it is determined that the defendant pleading Edwards has been out of custody for two weeks before the contested interrogation, the court is spared the fact-intensive *112 inquiry into whether he ever, anywhere, asserted his Miranda right to counsel.
III
The facts of this case present an additional issue. No one questions that Shatzer was in custody for Miranda purposes during the interviews with Detective Blankenship in 2003 and Detective Hoover in 2006. Likewise, no one questions that Shatzer triggered the Edwards protections when, according to Detective Blankenship’s notes of the 2003 interview, he stated that “ ‘he would not talk about this case without having an attorney present,’ ” 405 Md., at 589, 954 A. 2d, at 1120. After the 2003 interview, Shatzer was released back into the general prison population where he was serving an unrelated sentence. The issue is whether that constitutes a break in Miranda custody.
We have never decided whether incarceration constitutes custody for Miranda purposes, and have indeed explicitly declined to address the issue. See Perkins, 496 U. S., at 299. See also Bradley v. Ohio, 497 U. S. 1011, 1013 (1990) (Marshall, J., dissenting from denial of certiorari). Whether it does depends upon whether it exerts the coercive pressure that Miranda was designed to guard against — the “danger of coercion [that] results from the interaction of custody and official interrogation.” Perkins, supra, at 297 (emphasis added). To determine whether a suspect was in Miranda custody we have asked whether “there is a ‘formal arrest or restraint on freedom of movement’ of the degree associated with a formal arrest.” New York v. Quarles, 467 U. S. 649, 655 (1984); see also Stansbury v. California, 511 U. S. 318, 322 (1994) (per curiam). This test, no doubt, is satisfied by all forms of incarceration. Our cases make clear, however, that the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody. We have declined to accord it “talismanic power,” because Miranda is to be enforced “only in those types of situations in which the concerns that powered the decision are impli *113 cated.” Berkemer v. McCarty, 468 U. S. 420, 437 (1984). Thus, the temporary and relatively nonthreatening detention involved in a traffic stop or Terry stop, see Terry v. Ohio, 392 U. S. 1 (1968), does not constitute Miranda custody. McCarty, supra, at 439-440. See also Perkins, supra, at 296.
Here, we are addressing the interim period during which a suspect was not interrogated, but was subject to a baseline set of restraints imposed pursuant to a prior conviction. Without minimizing the harsh realities of incarceration, we think lawful imprisonment imposed upon conviction of a crime does not create the coercive pressures identified in Miranda.
Interrogated suspects who have previously been convicted of crime live in prison. When they are released back into the general prison population, they return to their accustomed surroundings and daily routine — they regain the degree of control they had over their lives prior to the interrogation. Sentenced prisoners, in contrast to the Miranda paradigm, are not isolated with their accusers. They live among other inmates, guards, and workers, and often can receive visitors and communicate with people on the outside by mail or telephone.
Their detention, moreover, is relatively disconnected from their prior unwillingness to cooperate in an investigation. The former interrogator has no power to increase the duration of incarceration, which was determined at sentencing.[8] And even where the possibility of parole exists, the former interrogator has no apparent power to decrease the time *114 served. This is in stark contrast to the circumstances faced by the defendants in Edwards, Roberson, and Minnick, whose continued detention as suspects rested with those controlling their interrogation, and who confronted the uncertainties of what final charges they would face, whether they would be convicted, and what sentence they would receive.
Shatzer’s experience illustrates the vast differences between Miranda custody and incarceration pursuant to conviction. At the time of the 2003 attempted interrogation, Shatzer was already serving a sentence for a prior conviction. After that, he returned to the general prison population in the Maryland Correctional InstitutionHagerstown and was later transferred, for unrelated reasons, down the street to the Roxbury Correctional Institute. Both are medium-security state correctional facilities. See Maryland Div. of Correction Inmate Handbook 7 (2007), online at http://dpscs.md.gov/rehabservs/doc/pdfs/ 2007_Inmate_Handbook.pdf (all Internet materials as visited Feb. 22, 2010, and available in Clerk of Court’s case file). Inmates in these facilities generally can visit the library each week, id., at 28; have regular exercise and recreation periods, id., at 17; can participate in basic adult education and occupational training, id., at 26, 7; are able to send and receive mail, id., at 21-22, 16; and are allowed to receive visitors twice a week, see http://dpscs.md.gov/locations/ mcih.shtml; http://www.dpscs.state.md.us/locations/rci.shtml. His continued detention after the 2003 interrogation did not depend on what he said (or did not say) to Detective Blankenship, and he has not alleged that he was placed in a higher level of security or faced any continuing restraints as a result of the 2003 interrogation. The “inherently compelling pressures” of custodial interrogation ended when he returned to his normal life.
IV
A few words in response to Justice Stevens’ concurrence: It claims we ignore that “[w]hen police tell an indigent *115 suspect that he has the right to an attorney” and then “reinterrogate” him without providing a lawyer, “the suspect is likely to feel that the police lied to him and that he really does not have any right to a lawyer.” Post, at 121 (opinion concurring in judgment) (hereinafter concurrence). See also post, at 123, 126, n. 11, 130, n. 16. The fallacy here is that we are not talking about “reinterrogating” the suspect; we are talking about asking his permission to be interrogated. An officer has in no sense lied to a suspect when, after advising, as Miranda requires, ‘You have the right to remain silent, and if you choose to speak you have the right to the presence of an attorney,” he promptly ends the attempted interrogation because the suspect declines to speak without counsel present, and then, two weeks later, reapproaches the suspect and asks, “Are you now willing to speak without a lawyer present?”
The “concer[n] that motivated the Edwards line of cases,” post, at 121, n. 2, is that the suspect will be coerced into saying yes. That concern guides our decision today. Contrary to the concurrence’s conclusion, post, at 122, 124-125, there is no reason to believe a suspect will view confession as “ ‘the only way to end his interrogation’ ” when, before the interrogation begins, he is told that he can avoid it by simply requesting that he not be interrogated without counsel present — an option that worked before. If, as the concurrence argues will often be the case, post, at 124, a break in custody does not change the suspect’s mind, he need only say so.
The concurrence also accuses the Court of “ignor[ing] that when a suspect asks for counsel, until his request is answered, there are still the same ‘inherently compelling’ pressures of custodial interrogation on which the Miranda line of cases is based.” Post, at 123. We do not ignore these pressures; nor do we suggest that they disappear when custody is recommenced after a break, see post, at 124. But if those pressures are merely “the same” as before, then Miranda provides sufficient protection — as it did before. The *116 Edwards presumption of involuntariness is justified only in circumstances where the coercive pressures have increased so much that suspects’ waivers of Miranda rights are likely to be involuntary most of the time. Contrary to the concurrence’s suggestion, post, at 122, it is only in those narrow circumstances — when custody is unbroken — that the Court has concluded a “ ‘fresh se[t] of Miranda warnings’ ” is not sufficient. See Roberson, 486 U. S., at 686.
In the last analysis, it turns out that the concurrence accepts our principal points. It agrees that Edwards prophylaxis is not perpetual; it agrees that a break in custody reduces the inherently compelling pressure upon which Edwards was based; it agrees that Shatzer’s release back into the general prison population constituted a break in custody; and it agrees that in this case the break was long enough to render Edwards inapplicable. Post, at 129-130. We differ in two respects: Instead of terminating Edwards protection when the custodial pressures that were the basis for that protection dissipate, the concurrence would terminate it when the suspect would no longer “feel that he has ‘been denied the counsel he has clearly requested,’” post, at 129. This is entirely unrelated to the rationale of Edwards. If confidence in the police’s promise to provide counsel were the touchstone, Edwards would not have applied in Minnick, where the suspect in continuing custody actually met with appointed counsel. The concurrence’s rule is also entirely unrelated to the existence of a break in custody. While that may relieve the accumulated coercive pressures of custody that are the foundation for Edwards, it is hard to see how it bolsters the suspect’s confidence that if he asks for counsel he will get one.
And secondly, the concurrence differs from us in declining to say how long after a break in custody the termination of Edwards protection occurs. Two and one-half years, it says, is clearly enough — but it gives law enforcement authorities no further guidance. The concurrence criticizes our use of *117 14 days as arbitrary and unexplained, post, at 123-124, and n. 7. But in fact that rests upon the same basis as the concurrence’s own approval of a 214-year break in custody: how much time will justify “treating the second interrogation as no more coercive than the first,” post, at 129. Failure to say where the line falls short of 214 years, and leaving that for future case-by-case determination, is certainly less helpful, but not at all less arbitrary.
* * *
Because Shatzer experienced a break in Miranda custody lasting more than two weeks between the first and second attempts at interrogation, Edwards does not mandate suppression of his March 2006 statements. Accordingly, we reverse the judgment of the Court of Appeals of Maryland, and remand the case for further proceedings not inconsistent with this opinion.

It is so ordered.

 The State filed a nolle prosequi to the second-degree sexual offense charge, and consented to dismissal of the misdemeanor charges as barred by the statute of limitations.

 Jail is a “local government’s detention center where persons awaiting trial or those convicted of misdemeanors are confined.” Black’s Law Dictionary 910 (9th ed. 2009). Prison, by contrast, is a “state or federal facility of confinement for convicted criminals, esp. felons.” Id., at 1314.

 Justice Stevens points out, post, at 126 (opinion concurring in judgment), that in Minnick, actual pre-reinterrogation consultation with an attorney during continued, custody did not suffice to avoid application of Edwards. That does not mean that the ability to consult freely with attorneys and others does not reduce the level of coercion at all, or that it is “only questionably relevant,” post, at 125, to whether termination of custody reduces the coercive pressure that is the basis for Edwards’ super-prophylactic rule.

 The State’s alternative argument in the present case is that the substantial lapse in time between the 2008 and 2006 attempts at interrogation independently ended the Edwards presumption. Our disposition makes it unnecessary to address that argument.

 This assumes that Roberson’s extension of Edwards to subsequent interrogation for a different crime and Minnick's extension of Edwards to subsequent interrogation by a different law enforcement agency would apply even when the place of custody and the identity of the custodial agency are not the same (as they were in Roberson and Minnick) as those of the original interrogation. That assumption would seem reasonable if the i/dwards-suspending effect of a termination of custody is rejected. Reinterrogation in different custody or by a different interrogating agency would seem, if anything, less likely than termination of custody to reduce coercive pressures. At the original site, and with respect to the original interrogating agency, the suspect has already experienced cessation of interrogation when he demands counsel — which he may have no reason to expect elsewhere.

 According to a recent study, 67.5% of prisoners released from 15 States in 1994 were rearrested within three years. See Dept. of Justice, Bureau of Justice Statistics, Special Report, Recidivism of Prisoners Released in 1994 (NCJ 193427, 2002).

 A defendant who experiences a 14-day break in custody after invoking the Miranda, right to counsel is not left without protection. Edwards establishes a presumption that a suspect’s waiver of Miranda rights is involuntary. See Arizona v. Roberson, 486 U. S. 675, 681 (1988). Even without this “second layer of prophylaxis,” McNeil v. Wisconsin, 501 U. S. 171, 176 (1991), a defendant is still free to claim the prophylactic protection of Miranda — arguing that his waiver of Miranda rights was in fact involuntary under Johnson v. Zerbst, 304 U. S. 458 (1938). See Miranda, 384 U. S., at 475.

 We distinguish the duration of incarceration from the duration of what might be termed interrogative custody. When a prisoner is removed from the general prison population and taken to a separate location for questioning, the duration of that separation is assuredly dependent upon his interrogators. For which reason once he has asserted a refusal to speak without assistance of counsel Edwards prevents any efforts to get him to change his mind during that interrogative custody.