RYAN, Judge
(concurring in the result):
This case presents the very close question whether, under the circumstances, the Naval Criminal Investigative Service’s (NCIS) request for consent to search Appellant’s personal belongings constituted a reinitiation of interrogation under Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and, therefore, a violation of Appellant’s Fifth Amendment right to not incriminate himself. It is clear that a mere request for a permissive search authorization is not itself an interrogation, see United States v. Frazier, 34 M.J. 135, 137 (C.M.A.1992) (“A request for a consent to search does not infringe upon Article 31 or Fifth Amendment safeguards against self-incrimination because such requests are not interrogations and the consent given is ordinarily not a statement.”), and I do not read the majority to suggest that it is.
Recognizing, however, that a mere request for a search authorization is not an interrogation does not answer the distinct question whether, under the unique circumstances of this case, the reinitiation of contact by NCIS for an otherwise permissible purpose was “reasonably likely to elicit an incriminating response from the suspect,” and thus an interrogation nonetheless. Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (footnote omitted). In my view, the admissibility of Appellant’s confession turns on that question, and no cases with like facts clearly dictate the answer.
In Edwards v. Arizona, the Supreme Court held that “when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.” 451 U.S. at 484, 101 S.Ct. 1880. The Court further held that when an accused invokes his right to counsel, he is “not subject to further interrogation ... until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.” Id. at 484-85, 101 S.Ct. 1880. Statements made after a suspect invokes his right to counsel and in response to further custodial interrogation “d[o] not amount to a valid waiver and hence [are] inadmissible.” Id. at 487, 101 S.Ct. 1880.
This bright-line rule serves as a “second layer of prophylaxis” safeguarding “a suspect’s right to have counsel present at a subsequent interrogation if he had previously requested counsel,” Maryland v. Shatzer, 559 U.S. 98, 130 S.Ct. 1213, 1219, 175 L.Ed.2d 1045 (2010) (citation and internal quotation marks omitted), and is separate and distinct from the question whether a suspect’s waiver was otherwise “knowing, intelligent, and voluntary under the ‘high standard] of proof ... [set forth in] Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938),’” Shatzer, 130 S.Ct. at 1219 (alterations in original) (quoting Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)); see also Oregon v. Bradshaw, 462 U.S. 1039, 1044-45, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (plurality opinion); id. at 1053, 103 S.Ct. 2830 (Marshall, J., with whom Brennan, J., Blackmun, J., and Stevens, J., joined, dissenting) (agreeing with the majority on this point of law). My agreement with Chief Judge Baker, then, that Appellant’s waiver was not involuntary under “Zerbst ’s traditional standard of waiver,” Shatzer, 130 S.Ct. at 1219, does not end the inquiry.
Edwards does not protect against all reini-tiations of contact with a suspect held in continuous custody who has invoked his right to counsel — only those that the government should reasonably expect to result in an in *301 criminating statement. See Innis, 446 U.S. at 301, 100 S.Ct. 1682. We view the latter class of reinitiations with a jaundiced eye and compare it to the psychological ploys that necessitated the protections first instituted in Miranda. See Miranda, 384 U.S. at 448-57, 86 S.Ct. 1602. Whether NCIS’ reinitiation of contact with Appellant should be deemed a reinitiation of interrogation in contravention of Edwards turns on whether NCIS should have known that its actions were “reasonably likely to elicit an incriminating response.” Innis, 446 U.S. at 301, 100 S.Ct. 1682; see also United States v. Brabant, 29 M.J. 259, 262-63 (C.M.A.1989).
In making this determination, we must consider, among other things, that: (1) after Appellant invoked his right to counsel during his initial interrogation, he was held in sequestration in a war zone for seven days; (2) during this period of solitary confinement, Appellant was neither provided an attorney nor permitted to contact one; (3) Appellant was not permitted to speak with anyone other than the chaplain, use any facilities other than the head and shower, or have access to phones, computers, or other methods of communication; (4) the Government’s explanation as to why it did not provide Appellant with an attorney or the ability to even contact one during this seven-day period of sequestration was that “[it] is not required,” Audio recording of oral argument at 29:18, United States v. Hutchins, 72 M.J. 294 (C.A.A.F.2012) http://www.armfor.uscourts. gov/newcaaftcalendar/2012-ll.htm# 13; (5) after Appellant was held in sequestration for seven days, the NCIS agent who had conducted Appellant’s initial interrogation reini-tiated contact with him to obtain a permissive search authorization; and (6) Appellant did not make a statement until the day following NCIS’ request for consent to search and after cleansing warnings were provided.
While (6) is strong evidence that Appellant’s confession was not involuntary under Zerbst, it does not answer the altogether different question whether, under the circumstances, NCIS should have known that its reinitiation of contact with Appellant, made for any purpose, was reasonably likely to elicit an incriminating statement in violation of Edwards. The military judge did not consider this question, which is different from whether law enforcement was engaged in intentional subterfuge.
After considering the facts outlined above, and that the prosecution has the burden to “demonstrate by a preponderance of the evidence that [Appellant] initiated the communication leading to the waiver,” Military Rule of Evidence 305(g)(2)(B)(i), I resolve this close question in Appellant’s favor.
Moreover, while I agree with much of Chief Judge Baker’s analysis of whether the Secretary of the Navy’s (the Secretary) comments resulted in unlawful command influence, I disagree with two aspects of his discussion.
First, in my view, Chief Judge Baker blurs the distinction between the doctrines of actual and apparent unlawful command influence by suggesting that the Secretary of the Navy’s comments did not constitute unlawful command influence either because (1) the Secretary did not intend to influence the outcome of Appellant’s proceedings, or (2) his comments did not actually affect any judicial or reviewing authority. See Hutchins, 72 M.J. at 313, 314-15, 317-18 (Baker, C.J., dissenting). Of course, if a speaker intends to influence a judicial or reviewing authority and that speaker actually influences that authority, the speaker will have likely committed actual unlawful command influence. See United States v. Lewis, 63 M.J. 405, 414 (C.A.A.F.2006) (finding actual unlawful command influence where the Government’s “orchestrated effort to unseat [the military judge] exceeded any legitimate exercise of [its] right” to challenge her). In my view, apparent unlawful command influence may be shown even without proof that the speaker intended to influence a particular authority or that any authority was actually influenced. The focus of apparent unlawful command influence is whether a reasonable, disinterested member of the public, fully informed of all the facts, would perceive the military justice system as fair. Id. at 415.
*302 Second, Article 37, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 837 (2006), which prohibits unlawful command influence, has been in existence since the UCMJ was established in 1950, see Act of May 5, 1950, Pub.L. No. 81-506, ch. 169, 64 Stat. 107, 120 (Article 37), and there has been no showing whatsoever that its prohibition against unlawful command influence trammels upon the statutory or constitutional duties of senior civilian leaders such as the Secretary, or that the two are incompatible in any way. I thus disagree that there is any justification for the civilian head of the Department of the Navy’s inflammatory comments on a case where neither appellate review nor the clemency process are complete. But see Hutchins, 72 M.J. at 313-14 (Baker, C.J., dissenting) (“Senior officials dealing with national security questions that also implicate military justice concerns must contemplate ... the impact on foreign relations and national security of not commenting at all.”).
Appellant was convicted of unpremeditated murder. In November 2009, despite both ongoing appellate review and the annual Naval Clemency & Parole Board (NC & PB) review process, the Secretary made widely disseminated, public comments, which left no doubt about his strong view that Appellant had already received substantial clemency from the convening authority and would receive no further clemency. Moreover, despite the fact that Appellant was acquitted of premeditated murder, the Secretary emphatically stated that Appellant had committed that crime. As quoted in several military publications, he stated that the murder was:
[S]o completely premeditated, that it was not in the heat of battle, that not only was the action planned but the cover-up was planned, and that they picked somebody at random, just because he happened to be in a house that was convenient. He was murdered.
The Secretary further stated that (1) Appellant had not acted “ ‘in the fog of war,’ ” (2) “ ‘[the] sentence [was] commensurate with the crime,’” and (3) Appellant had been granted “ ‘substantial clemency already,’ ” referring to the convening authority’s approval of only eleven of the fifteen years confinement provided for in the adjudged sentence.
Following these events, and as relevant to the unlawful command influence claim before this Court, the NC & PB, which had previously recommended that Appellant receive a six-year reduction in his sentence, recommended that he receive no clemency or parole at all. Whether the Secretary’s comments actually caused the NC & PB’s change of heart is irrelevant in assessing apparent unlawful command influence, as “the mere appearance of unlawful command influence may be ‘as devastating to the military justice system as the actual manipulation.’ ” United States v. Ashby, 68 M.J. 108, 128 (C.A.A.F.2009) (quoting United States v. Ayers, 54 M.J. 85, 94-95 (C.A.A.F.2000)).
In Appellant’s case, “a reasonable member of the public,” Lewis, 63 M.J. at 415, apprised of the Secretary’s unequivocal, publicized position that Appellant deserved no further clemency, would “harbor a significant doubt about the fairness,” id., of Appellant’s annual NC & PB clemency review. This doubt would be bolstered by (1) the NC & PB’s dramatic change following the Secretary’s comments that Appellant receive no clemency or parole; (2) the subordinate status of all NC & PB members to the Secretary, see Dep’t of the Navy, Sec’y of the Navy Instruction, Dep’t of the Navy Clemency and Parole Systems pt. I, § 111, at 1-2 (June 12, 2003) [hereinafter SECNAVINST 5815.3 J]; and (3) the fact that any NC & PB clemency or parole recommendation would have to be approved by the Assistant Secretary of the Navy M & RA, see id. pt. II, § 205, at II — 3, who was presumably aware of the Secretary’s position on this matter. That Appellant ultimately received 251 days of clemency — a period commensurate with the duration of his release following United States v. Hutchins, 68 M.J. 623 (N.-M.Ct.Crim.App.2010) — is far from curative of the apparent unlawful command influence when viewed in light of the NC & PB’s initial recommendation of six years of clemency.
No member of the public, aware of the remarks made and the change in clemency *303 recommendation that occurred, could fail to harbor grave concerns that the change in the NC & PB’s clemency recommendation was directly related to the Secretary’s intemperate remarks about Appellant, in a case where neither appellate review nor clemency proceedings had been completed. These concerns are not cured by the facts that (1) Appellant has no right to any clemency at all, (2) the Secretary need not feel impartial about Appellant’s actions, and (3) the Secretary has the ultimate authority to grant any or no clemency. Here, the Secretary’s brash public remarks resulted in the appearance of unlawful command influence.
In my view, the Secretary’s disturbing and inappropriate comments created an “intolerable strain on public perception of the military justice system,” United States v. Simpson, 58 M.J. 368, 374 (C.A.A.F.2003) (citation and internal quotations marks omitted), with respect to the clemency proceedings. We are not, however, in a position to repair this damage because SECNAVINST 5815.3J limits the NC & PB’s role in Appellant’s clemency process to one that merely advises the Secretary on a matter committed, by statute, to his discretion. SECNAVINST 5815.3J, pt. Ill, § 308(a)(6)(d)-(e), at III-6. Moreover, Ohio Adult Parole Authority v. Woodard, 523 U.S. 272, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998), represents a sharp limitation on this Court’s role in safeguarding clemency proceedings that “are not part of the trial — or even of the adjudicatory process,” id. at 284, 118 S.Ct. 1244.
These reasons, however, provide a very different basis for declining to act in this case than either suggesting that such comments did not result in apparent unlawful command influence because the Secretary did not intend to or actually affect the proceedings or are otherwise justifiable.
“ ‘[A] prime motivation for establishing [this Court] was to erect a further bulwark against impermissible command influence.’ ” United States v. Harvey, 64 M.J. 13, 17 (C.A.A.F.2006) (citation and footnote omitted). “Fulfilling this responsibility is fundamental to fostering public confidence in the actual and apparent fairness of our system of justice.” Id. We cannot decline to criticize the Secretary for making the remarks he made, and by implication lend our own judicial imprimatur to the civilian leadership’s making of such public statements about cases where neither appellate review nor the clemency process are complete.