DANIEL E. SCOTT, J.
Appellant ("Defendant") challenges his conviction for first-degree murder, charging error in (1) the denial of his motion to suppress his police confession, and (2) allowing the jury to view his sister's police statement during jury deliberations.
Background[1]
When Anita Dunn went missing, police immediately suspected Defendant, her landlord. Police first interviewed Defendant on May 31 ("Interview 1"). After being Mirandized,[2] Defendant denied involvement in Dunn's disappearance and answered questions for some 20 minutes, then invoked his right to counsel, declined to answer other questions, made bond on an unrelated misdemeanor, and was released.
*110 Police recovered Dunn's body from an abandoned mine shaft two days later. She had been strangled.
The next morning, June 3, Defendant told his wife that he had killed Dunn. He also confessed to his sister, describing how he had strangled Dunn and dumped her body. His sister notified police, who arrested Defendant that afternoon, took him to an interview room, and Mirandized him at 3:56 p.m. ("Interview 2"). Defendant said he wanted to cooperate, but that a lawyer had told him not to talk to police. Defendant consistently maintained that position, despite gentle invitations to tell his side of the story during unsuccessful attempts to call the attorney, after which Defendant was moved to a holding cell.
Alone in the holding cell, Defendant called his wife at 7:30 p.m. They talked for nearly eight minutes. She begged Defendant to come clean to the police:
[Wife]: Todd, listen to me please. ... I beg you, with everything that is within me, I love you, please find a nice person there and just try to explain things, please.
[Defendant]: Is that what you think I need to do?
[Wife]: Yes, Todd. Please, let's get this nightmare behind us, please.
[Defendant]: That detective told me I could talk to him and call him anytime if I wanted to talk.
[Wife]: Todd, talk to him.
[Defendant]: OK, I'm going to. OK, I'm going to -
[Wife]: Talk to him.
After that call, Defendant asked a jailer to summon a detective, who Mirandized Defendant again at 7:50 p.m. ("Interview 3"). Before any question was asked, Defendant volunteered that "I'm just gonna be honest ... I did kill this woman. OK? But I would like to give you a statement on that." Defendant proceeded to detail everything on video, first a statement at the police station, then a filmed "walk-through" of his actions at the murder scene and along the route he took to dispose of the corpse. The admission of those statements at trial, where jurors took just 27 minutes to find Defendant guilty, is Defendant's first complaint on appeal.
Point 1
Defendant claims the trial court erred in denying his motion to suppress and admitting his statements at trial. We will reverse only if we find clear error. Nichols , 504 S.W.3d at 759. We defer to the trial court's fact findings and consider questions of law de novo. Id .
Defendant theorizes that his Interview 3 statements and rights-waiver were coerced by an unlawful Interview 2. He cites Edwards v. Arizona , 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), which held that custodial interrogation should cease when an accused invokes the right to counsel "unless the accused himself initiates further communication, exchanges, or conversations with the police" ( id . at 484-85, 101 S.Ct. 1880 ), and argues that:
1. Interview 2 violated Edwards because Defendant invoked his right to counsel three days earlier during custodial interrogation by the same police department regarding the same issues; and
2. Such violation tainted Defendant's rights-waiver and statements hours later during Interview 3.
We disagree. Assuming arguendo that Edwards barred even an attempt at Interview 2, the court did not clearly err in denying suppression given its findings that Defendant's confession and statements "were initiated by Defendant," were "not a result of coercion by law enforcement,"
*111 and "were voluntary." The record amply supports such findings.
At bottom, the state bore the burden to show that Defendant knowingly, intelligently, and voluntarily waived his previously-invoked right to counsel by initiating further conversation with police. Nichols , 504 S.W.3d at 763 (citing Maryland v. Shatzer, 559 U.S. 98, 104, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010) ).
Knowing and Intelligent
The "knowing and intelligent" requirement considers whether an accused understood the warnings, knew he could remain silent and request a lawyer, and was aware that the state planned to use his statements to secure a conviction. Id . at 764. Defendant received oral and written Miranda warnings before each of Interviews 1, 2 and 3. Nothing in the videos or elsewhere of record suggests that Defendant was confused about those rights; to the contrary, he expressly invoked them in both Interviews 1 and 2. The record also shows Defendant's criminal-procedure experience, including a previous murder conviction. All these provide a sufficient basis for a court to find that Defendant understood the warnings and his rights. Id .
Voluntary
"The test for voluntariness is whether, under the totality of the circumstances, the defendant was deprived of free choice to admit, to deny, or to refuse to answer and whether physical or psychological coercion was of such a degree that the defendant's will was overborne at the time he confessed." State v. Rousan , 961 S.W.2d 831, 845 (Mo. banc 1998). The trial court specifically found Defendant's statements were voluntary and not a result of coercion by law enforcement.
As noted, Defendant alleges that an Interview 2 Edwards violation coerced his Interview 3 confession. Yet he never suggests (let alone shows) how law enforcement overbore his will or deprived him of free choice before he confessed. What the record shows - and the trial court obviously credited - was Defendant's wife begging him to fess up to the police, Defendant assuring her that he would, then Defendant promptly and voluntarily doing so.[3]
*112 As Nichols aptly summarized, our Supreme Court established the rule in Edwards
to ensure that police will not take advantage of the mounting coercive pressures of prolonged police custody by repeatedly attempting to question a suspect who previously requested counsel until the suspect is badgered into submission. Edwards created a judicially crafted rule, which is only justified when the benefits of its prophylactic purpose outweigh its costs. Extending the Edwards rule yields diminished benefits and increases its costs. The fundamental purpose of the Edwards rule is to preserve an accused's Fifth Amendment rights by preventing coerced, involuntary confessions. However, an overly broad application of the Edwards rule forces courts to suppress voluntary confessions and deters law enforcement officers from even trying to obtain them. Suppressing voluntary confessions would also impose a heavy cost; confessions are trustworthy and highly probative evidence, and therefore, essential to society's compelling interest in finding, convicting, and punishing those who violate the law.
504 S.W.3d at 759-60 (Supreme Court case citations and quotation marks omitted; emphasis in original). We agree. Point 1 fails.
Point 2
During deliberations, jurors sent a note requesting to see Defendant's sister's written statement to police, admitted as Exhibit 107 but never published to the jury. Over a defense objection, the statement was sent back to the jury. Point 2 alleges error "in that that exhibit was testimonial in nature, which resulted in [the sister's] testimony being unduly bolstered and emphasized, allowing the jury to give it undue weight."
We cannot find error or prejudice, both of which Defendant must prove, because he has not deposited Exhibit 107 as required by Missouri Court Rules 30.05 and 81.16(a). The presumption that an omitted exhibit's content supports the trial court's ruling ( State v. Jones , 525 S.W.3d 132, 136 n.4 (Mo. App. 2017) ) dooms this point.
For that matter, the sister's scant testimony, whether or not "bolstered," involved nothing in dispute. In two transcript pages of direct examination, she related, without objection, only that Defendant said he had murdered Dunn in anger, choking her with his hands, finishing her off with a lamp cord, then tied a rock around her body and dropped her down a mineshaft. Defendant disputed none of this at trial. The defense, in opening statement, admitted that Defendant strangled Dunn. Defendant testified in great and grisly detail how he killed Dunn, secreted her body, and lied to cover up his crime. We deny Point 2 and affirm the conviction.
WILLIAM W. FRANCIS, JR., P.J. - CONCURS
MARY W. SHEFFIELD, J. - CONCURS

Summarized from the trial and suppression-hearing record, viewing all facts and reasonable inferences favorably to the rulings challenged on appeal. State v. Nichols , 504 S.W.3d 755, 759 (Mo. App. 2016). We omit loathsome details out of respect for the victim as Defendant does not contest the sufficiency of the evidence to support his conviction.

Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

As relevant to our review, we now quote Defendant's phone call with his wife even more fully:
[Defendant]: I told them, I said, I want to cooperate and say everything I think I know, you know, but this lawyer told me not to say anything....
[Wife]: Listen to me, please listen to me. ... I feel as though that $100 that was spent today on [attorney] was nothing but a big waste of money.
[Defendant]: Right.
...
[Defendant]: Listen, honey, listen, I just wanted to make sure you are home safe, OK? I was so worried about that, you know? Linda I am so sorry. ... Did you [ever] get ahold of that lawyer?
[Wife]: No, Todd, look. ... This sh*t's all over the news. ...
[Defendant]: Is my name on the news?
[Wife]: I'm gonna assume so because people [are] blowing my phone up.
...
[Defendant]: Listen, Linda. I told that cop I want to cooperate and say everything I think I know, you know, but I -
[Wife]: Todd, listen to me please.
[Defendant]: Yes.
[Wife]: I beg you, with everything that is within me, I love you, please find a nice person there and just try to explain things, please.
[Defendant]: Is that what you think I need to do?
[Wife]: Yes, Todd. Please, let's get this nightmare behind us, please.
[Defendant]: That detective told me I could talk to him and call him anytime if I wanted to talk.
[Wife]: Todd, talk to him.
[Defendant]: OK, I'm going to. OK, I'm going to -
[Wife]: Talk to him.
[Defendant]: I'm gonna try to get hold of someone and get him back up here and I'm just going to tell him the truth then, Linda.
...
[Wife]: Todd, listen, just be nice to them.
[Defendant]: Honey, I have been. OK, that's all I needed to hear from you.
...
[Defendant]: I'm going to get this detective back up here and I'm gonna probably be talking to him half the night then, OK?