*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

DAREN DONELL FENDERSON,

        Defendant-Appellee.

UNPUBLISHED
June 6, 2024

No. 367926
Wayne Circuit Court
LC No. 23-000412-01-FC

Before: SWARTZLE, P.J., and SERVITTO and GARRETT, JJ.

GARRETT, J. (*dissenting*).

In the setting of a custodial interrogation, the United States Supreme Court has long held that a suspect who invokes his right to have counsel present "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v Arizona*, 451 US 477, 484-485; 101 S Ct 1880; 68 L Ed 2d 378 (1981). In this case, I would conclude that the investigating officer impermissibly interrogated defendant, Daren Fenderson, after he invoked his right to have counsel present, such that Fenderson's subsequent confession was obtained in violation of *Edwards*. I would therefore affirm the trial court's order granting Fenderson's motion to suppress and must respectfully dissent from the majority opinion to the contrary.

## I. RELEVANT FACTS

On August 2, 2022, Detroit Police Sergeant Reginald Beasley attempted to question Fenderson in connection with an alleged hit-and-run incident resulting in death, but discontinued the interrogation after determining Fenderson was under the influence of alcohol or an intoxicating narcotic. The following day, Fenderson appeared sober and alert and initially waived his rights under *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). Fenderson told the interrogating officers that he was carjacked on the night in question and the carjacker must have struck and killed the victim. The officers told Fenderson that video surveillance footage put him behind the wheel at the time of the collision. Fenderson responded: "Imma tell y'all what y'all want to hear but can I have a lawyer first?" Sergeant Beasley inquired: "Do you have a lawyer?" Fenderson replied: "No, but y'all gonna appoint one right?" Sergeant Beasley left the interrogation

-1-

room, indicating he needed to make some calls. Fenderson was left alone in the room for two-and-a-half hours.

When Sergeant Beasley finally returned, he brought a uniformed officer who cuffed Fenderson's hands behind his back. Sounding desperate and concerned, Fenderson asked: "Where's my lawyer?" Sergeant Beasley responded: "You don't got one so . . .," and Fenderson stated: "Wait, huh?" Sergeant Beasley answered: "You gotta have a lawyer. You have one?" Fenderson incredulously stated: "No, you said that you gonna call one." Sergeant Beasley indicated he "tried to call one, but ain't nobody available, [and] you ain't got no money, so. . . ." Fenderson stated: "Yeah I do, the money that I came in with. You can't use that money?" Sergeant Beasley asserted he could not use that money to hire an attorney. After several confused exclamations from Fenderson, Sergeant Beasley continued: "You said you wanted an attorney. I can't talk to you no more without an attorney, so the story you gave is the story I'll go with."

Fenderson expressed confusion and Sergeant Beasley explained that Fenderson would be taken back to the jail while the officers submitted a warrant to the prosecution. Fenderson again expressed confusion. The sergeant replied: "When you request an attorney, I can't talk to you no more about the case. If you wanted to talk to me, you just say that you want to talk without an attorney. But you said you wanted an attorney, and I'm not allowed to talk to you by law." Fenderson asserted he wanted "to get this over with." Sergeant Beasely offered to reread Fenderson his rights to allow him to agree to speak without an attorney despite telling Fenderson that he does not want him "to feel compelled to talk to" him without an attorney just because he did not want to be transported to the jail. Fenderson hesitantly agreed to speak to the officers without an attorney and Sergeant Beasley left the room again.

While alone in the interrogation room, Fenderson muttered to himself and began to cry. Sergeant Paul Brown then entered the interrogation room and reread Fenderson his *Miranda* rights. Fenderson expressed concern that matters were "not going right." Sergeant Brown indicated he was only there to secure a waiver of rights and that he had no role in the investigation. When Sergeant Brown asked if anyone forced or coerced him into giving a statement, Fenderson stated: "That's why I don't understand . . .," but he signed the waiver form anyway. Fenderson proceeded to tell the investigating officers that he did hit the victim, but claimed he acted in self-defense.

Before trial, Fenderson moved to suppress his statements to the police, contending he did not knowingly and voluntarily waive his right to counsel. Fenderson relied heavily on Sergeant Beasley's preliminary examination testimony. At the preliminary examination, Sergeant Beasley indicated he stopped questioning Fenderson when he requested an attorney and "left the interview room and I attempted to get a lawyer for him but was unsuccessful." The following colloquy ensued:

> *Q*. Instead of ceasing and desisting the interview, you tried to get him a lawyer immediately?
>
> *A*. He requested an attorney. And I tried to contact our Control Center to get a show cause attorney and I was unsuccessful.

Defense counsel inquired whether the department had an attorney on call to represent suspects in line-ups. Sergeant Beasley responded he did not determine whether such an attorney was on call and available. Defense counsel appeared shocked, asking the court: "Have you ever heard of that, Judge, that the police is trying to get him a lawyer?" The prosecution subsequently elicited testimony that when Sergeant Beasely left the interrogation room, he made "efforts to try to find a lawyer."

Sergeant Brown testified at the preliminary examination that "[s]everal" officers "worked as a team" to attempt to find an attorney for Fenderson. Sergeant Brown personally contacted the notification and control center "and tried to get a show [up] attorney for him. The show [up] attorney that were on duty that particular day said she only do photo line-ups." Sergeant Brown asserted he continued his efforts, but was not successful in securing an attorney.

Defense counsel ultimately moved to exclude the waiver of rights form and Fenderson's subsequent statements at the preliminary examination. Counsel noted Fenderson requested counsel and this should have stopped the interrogation. Instead, the officers embarked on an "unusual" procedure "of them trying to get him a lawyer." Counsel continued:

> So at some point they recognize, they knew, their advantage, you know. It's a game. You know you're in a trying position. So they, these detectives know that this guy could go back to his cell. Go back to his cell, he's resting and leave this room because he invoked that Fifth Amendment right. Okay.
>
> But they capitalized on something, but he's clearly not clear about it. So I'm going to object.

The prosecutor retorted that Fenderson "popped his head out and he wanted to speak to the officers," after waiting for the officers to find him an attorney.

The district court admitted Fenderson's statements at the preliminary examination, finding "for probable cause purposes" that the statement was voluntarily given after Fenderson waived his rights. Following the bind over, and after considering Fenderson's motion to suppress, the prosecution's answer, and the record, however, the circuit court granted the motion to suppress the evidence from trial, leading to this interlocutory appeal.

## II. LEGAL BACKGROUND

In *Edwards*, 451 US 477, United States Supreme Court squarely addressed the requirements before interrogation may be reinitiated following a suspect's request for counsel. In *Maryland v Shatzer*, 559 US 98, 104-105; 130 S Ct 1213; 175 L Ed 2d 1045 (2010), the Court summarized the principles supporting *Edwards*:

> The rationale of *Edwards* is that once a suspect indicates that he is not capable of undergoing custodial questioning without advice of counsel, any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the inherently compelling pressures and not the purely voluntary choice of the suspect. Under this rule, a voluntary *Miranda* waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right

to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel. The implicit assumption, of course, is that the subsequent requests for interrogation pose a significantly greater risk of coercion. That increased risk results not only from the police's persistence in trying to get the suspect to talk, but also from the continued pressure that begins when the individual is taken into custody as a suspect and sought to be interrogated—pressure likely to increase as custody is prolonged. The *Edwards* presumption of involuntariness ensures that police will not take advantage of the mounting coercive pressures of prolonged police custody by repeatedly attempting to question a suspect who previously requested counsel until the suspect is badgered into submission. [Cleaned up.]

According to *Edwards*, 451 US at 484-485, "when an accused has invoked his right to have counsel present during custodial interrogation," the *accused* must personally "initiate[] further communication, exchanges, or conversations with the police" or the police may not reengage interrogation without the presence of counsel.

## III. ANALYSIS

I would affirm the circuit court's determination that Fenderson did not knowingly and voluntarily waive his right to counsel after invoking his right, and that his subsequent statements were inadmissible. Sergeant Beasley misled Fenderson, preventing Fenderson from making an informed decision.

### A.

When a suspect invokes his right to counsel during a custodial interrogation, all questioning must stop. *People v Tanner*, 496 Mich 199, 208; 853 NW2d 653 (2014). At oral argument, both the prosecution and the defense agreed the officers' actions to locate appointed counsel to represent Fenderson were highly unusual. Attorneys are on call to represent suspects during identification procedures, like live line-ups and photographic show-ups, but not to advise individuals during interrogation. Defense counsel specifically asserted there is no formal method of securing appointed counsel for an interrogation before arraignment. Further, the process to secure an attorney even for identification procedures is simply to call the Detroit Police Department's central notification and control center to ask them to contact on-call attorneys. The interrogating officers do not contact these attorneys directly. Both sides were unclear about what the officers actually did for more than two hours when the officers should have been well aware that a single phone call to the notification and control center was the only course of action. Indeed, defense counsel stated he had never encountered police officers attempting to find an attorney in this manner to represent a suspect being interrogated.

According to these concessions, a suspect undergoing interrogation is required to retain counsel if he or she wishes to immediately continue the interrogation with the representation of counsel. Both sides agreed that if the suspect requires appointed counsel, the officers must return the suspect to his or her cell and secure an arrest warrant. The matter then proceeds to district court arraignment. An arraignment must be conducted "without necessary delay," MCL 764.26, and a delay of more than 48 hours absent unusual circumstances is presumptively unreasonable,

*Riverside Co v McLaughlin*, 500 US 44, 56-57; 111 S Ct 1661; 114 L Ed 2d 49 (1991). Counsel is appointed just before arraignment and within 48 hours. Michigan Indigent Defense Commission, Standard 4, available at <https://michiganidc.gov/standards/#tab-id-4> (accessed May 15, 2024). See also *Oakland Co v State of Michigan*, 325 Mich App 247, 268-269; 926 NW2d 11 (2018) (holding that states are permitted to grant greater protections than required by the Constitution, including expanding the right to counsel to criminal arraignments). Interrogation may continue with appointed counsel after that point. Again, both sides asserted that this is the proper procedure in the face of a request for appointed counsel during a pre-arraignment interrogation.

B.

As noted, once a suspect has invoked his right to counsel, all questioning must stop and may only be reinitiated by the suspect personally. *Edwards*, 451 US at 484-485; *Tanner*, 496 Mich at 208. I believe Fenderson did not personally reinitiate the interrogation. The prosecutor stated at the hearing on Fenderson's motion to suppress that Fenderson "popped his head out" of the interrogation room because he wanted to reinitiate the interrogation. If Fenderson "popped his head out," it was more likely because he was concerned after being left alone in the small interrogation room for two-and-a-half hours with nothing to occupy his time. Further, if Fenderson had "popped his head out" and announced his intent to speak to the officers without the presence of counsel, Sergeant Beasley would not have brought a uniformed officer into the interrogation room to prepare Fenderson for transport.

Rather, Fenderson's decision to speak to the officers without counsel was a direct result of the uniformed officer cuffing his hands behind his back and Sergeant Beasley's confusing and misleading statements that there was no attorney available to represent Fenderson and that Fenderson could not afford to retain an attorney. Contrary to the majority's holding, I do not believe Fenderson reinitiated the interrogation; he was backed into a corner and agreed to continue without counsel as a result of the coercive atmosphere created by Sergeant Beasley.

C.

I disagree with the majority's conclusion that Fenderson "made multiple unequivocal requests to speak to the officers without an attorney present," fully understood his rights, and knowingly and voluntarily waived his right to counsel. In my view, the record demonstrates Sergeant Beasley's incomplete and contradictory statements misled Fenderson into believing he would not be appointed counsel. Fenderson's confusion was clear from the video recording and the rereading of his *Miranda* rights did not provide clarification.

I believe the record shows that Sergeant Beasley manipulated Fenderson's desire to "get this over with." Sergeant Beasley correctly informed Fenderson that he would be returned to his cell because the invocation of the right to counsel meant the end of the interrogation. Fenderson clearly expressed his confusion about the course of events. Sergeant Beasley made no attempt to clarify that Fenderson would return to his cell pending arraignment, at which time counsel would be appointed. Instead, Sergeant Beasley told Fenderson that he did not have an attorney and could not afford one. A reasonable person in Fenderson's situation could interpret Sergeant Beasley's

-5-

statements as meaning he or she could not have counsel at the interrogation, a legally incorrect proposition. Fenderson had no idea that counsel would be appointed in short order and likely feared he would be left to languish in jail awaiting the next step in the criminal process. Sergeant Beasley effectively sealed the deal by telling Fenderson that the investigating officers would rely on the version of events he had given during the first part of the interrogation, a story contradicted by video evidence.

Rereading the *Miranda* rights to Fenderson did not cure this error. Rereading a suspect these rights should clarify any confusion, not increase the level of misunderstanding. When Sergeant Brown read Fenderson his rights the second time, Fenderson suggested he was forced or coerced into waiving his right to counsel; after being asked whether he was forced or coerced into giving a statement, Fenderson replied: "That's why I don't understand. . . ." However, no one questioned Fenderson to ascertain whether his confusion or lack of understanding had resolved.

This Court's opinion in *People v Clark*, 330 Mich App 392; 948 NW2d 604 (2019), exemplifies what should be done when a suspect expresses confusion about his rights. In *Clark*, "[o]nly a few minutes passed between the initial reading of defendant's *Miranda* rights, his invocation of his right to counsel, and his subsequent decision to submit a signed statement." *Id*. at 400. Before beginning their second discussion, an officer summarized the *Miranda* rights and "reminded defendant that he had invoked his right to counsel and asked him if he had changed his mind and wanted to talk to them. Defendant told them that he had changed his mind, he wanted to speak with them, and he immediately informed the officers" that he wanted to follow the statement given by another suspect. *Id*. at 401.

No such clarifying information or questions were posed to Fenderson. Instead, after just being told there were no attorneys available and he could not afford counsel, Sergeant Brown merely reread the *Miranda* rights verbatim to Fenderson. No one clarified his rights when Fenderson stated: "That's why I don't understand. . . ." Fenderson was never given accurate information or advice to knowingly and voluntarily choose to give a statement to the officers.

The record of Fenderson's encounter with Sergeants Beasly and Brown demonstrates the officers misled Fenderson into involuntarily waiving his right to counsel during the interrogation and speaking to the officers without representation. I believe the circuit court correctly suppressed the resulting statements and would affirm.


/s/ Kristina Robinson Garrett