IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 29, 2021

## STATE OF TENNESSEE v. JAMES HOWARD HARMON, JR.

**Appeal from the Circuit Court for Blount County
Nos. C21251, C21252    Tammy Harrington, Judge**

### No. E2019-02044-CCA-R3-CD

The defendant, James Howard Harmon, Jr., appeals his Blount County Circuit Court jury convictions of second degree murder, especially aggravated kidnapping, theft of property valued at $500 or less, arson, and abuse of a corpse, arguing that the trial court erred by admitting into evidence his statement of April 10, 2012, and by admitting evidence in violation of Tennessee Rule of Evidence 404(b). Discerning no reversible error, we affirm.

### Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and ROBERT L. HOLLOWAY, JR., JJ., joined.

Mark C. Hazlewood, Knoxville, Tennessee (on appeal); Steven R. Hawkins, Maryville, Tennessee (at trial); and Amber Corn, Sevierville, Tennessee (at trial), for the appellant, James Howard Harmon, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Mike Flynn, District Attorney General; and Ryan Desmond and Tracy Jenkins, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Blount County Grand Jury charged the defendant with the first degree murder of Dilrea Sue Lett ("the victim"), the especially aggravated kidnapping of J.L.,[1] theft of property valued at $1,000 or more but less than $10,000, arson, and abuse of a

---

[1]    We will refer to Ms. Lett as "the victim" to distinguish her from her daughter, Shannon Lett, and to the minor kidnapping victim by her initials as is the policy of this court.

corpse for events occurring on June 20, 2011.[2]

At the April 2016, eight-day trial,[3] Douglas Fulmer, a detective with the Blount County Sheriff's Office ("BCSO"), testified that in June 2011, he worked as a therapist and foster care supervisor at Child Help Foster Family Agency of East Tennessee and lived on Reed Road in Louisville, Tennessee. The victim lived on East Cumberland Road, "behind my house on the other side of Reed Road." A few weeks prior to the incidents giving rise to the charges in this case, Mr. Fulmer found a stray dog in the neighborhood and went "house to house . . . trying to find the owner." At the victim's house, he met the defendant and briefly discussed the dog. Mr. Fulmer did not otherwise know the defendant, the victim, or the victim's son, Ty Lett.

Mr. Fulmer testified that in the early morning hours of June 20, 2011, he was in his living room "working on a training protocol for my employer" when he "heard a loud noise coming from what appeared to be the rear of my residence." He said that the noise "sounded to me at the time as if it was someone trying to kick open my back door. And so I retrieved a firearm from my bedroom, looked out the back door, didn't see anything immediately. And so I checked every other window and door of my house." When he did not see anything unusual, he returned to the back door where he initially heard the noise and "saw the residence behind me . . . engulfed in flames." The fire "appeared to be reaching the tops of the trees that were surrounding the house." Mr. Fulmer told his wife to call 9-1-1, and he ran "up to that house as quickly as possible." Because of "a very steep hill with very dense vegetation" between his and the victim's houses, he had to follow the roadway to reach the house, which he estimated took him five minutes. He did not see any people or vehicles when he arrived, but he saw the "entire left side" of the house "fully engulfed in flames." Because of the intense heat, he could not get closer than a few yards to the house and "decided to go to a neighbor's house to warn them." First responders arrived within a few minutes, and Mr. Fulmer provided a statement to law enforcement officers.

During cross-examination, Mr. Fulmer explained that he could see the victim's house from his back door despite "a hill that goes up to her house." He said that he did not see any people or vehicles coming from the direction of the victim's house when he was running toward it.

Kermit Easterling, a firefighter and instructor with the Blount County Fire Protection District, testified that he responded to a house fire at 821 East Cumberland in Blount County at 1:32 a.m. When he arrived, he saw that the "garage area of the house

---

[2]    The date of the offenses indicated in the indictment was June 29, 2011, but by agreement of the parties, the trial court amended the indictment to read June 20, 2011.

[3]    The defendant's first trial held December 2-5, 2015, ended in a mistrial.

was fully involved" with fire "coming out of" the roof, windows, and doors and that "[t]he roof had already collapsed in on it." The outside wall of the garage collapsed within a few minutes of his arrival. He later determined that the "garage section" of the house included a bedroom between the garage and "the main part of the house." He explained that when responding to any fire, his first step was to evaluate the scene, doing "what we call a window size-up before we ever leave the truck. We're looking out the window seeing what we can see; are there people in the yard, are there cars in the driveway, any hazards around, power lines, other things that are going to affect" his approach. Next, he would assess "the need for the fire and we also try to do what we call a 360-degree size-up, when we try to do a complete circle around the house," look in the windows to "see if we see anyone," "check[] doors to see other ways we can make entry into the home," and listen for "anyone calling out inside."

In this case, Mr. Easterling noticed "several baby items" on the front porch, which discovery heightened his concern "that we at least know the home is inhabited . . . . And it's going to make us search a home." All of the doors were locked, and he and Captain Jim Patty entered the house by kicking in the front door. He said that he "took the hose line and began fighting the fire" while Captain Patty did "a quick primary search of the house." Captain Patty did not find anyone. After the fire was under control, meaning "no longer actively growing," he and Captain Patty used a thermal imaging camera, which "allows us to see through the smoke and helps us pick up victims or other people in the home." They found the victim's body at 2:41 a.m. in the bedroom located in the garage area. They covered the victim's body with a blue tarp to prevent further damage but otherwise left the victim as found to preserve evidence for the investigators. He notified the BCSO of the deceased victim, and the fire investigators took control of the scene. He and other firefighters stayed at the scene to help "dig[] through materials" and "mak[e] sure the scene is safe, that they can access areas that they need."

During cross-examination, Mr. Easterling testified that he did not know whether the garage door was open or whether the door between the garage and the victim's bedroom was open at the time of the fire because both doors had fully burned. He agreed that open doors can help a fire spread because it "adds oxygen to the fire."

BCSO Sergeant Scotty Boyd testified that he was a corporal at the time of the fire and was the first to respond to the scene. No vehicles were in the driveway when he arrived, and he noted that the "far left side of the house, which appeared to be the garage area," was on fire. He later learned that a portion of the garage had been converted into a bedroom. Initially, he believed the incident to be "just . . . a house fire," and he did "what we normally do, which would be to try to locate the owner and start the paperwork, the report." After he learned that the victim had been found, he "actually stepped into the bedroom area" where the victim lay "in a bed right here next to the wall." At that point,

he "taped off the scene" and contacted the criminal investigations department, crime scene investigators, "and all my supervisors."

Sergeant Boyd said that the presence of children's toys in the front yard caused "concern[] that there was a child inside the house." The victim's son, Ty Lett, arrived at the scene and asked if they had found a baby in the house. Sergeant Boyd said that officers interviewed Mr. Lett at the scene and determined that he had been at a nearby bar. When they told Mr. Lett that they had found a body inside the house, Mr. Lett "was distraught. He actually took off running and started screaming, 'He killed her, he killed her, I'm going to kill him.'" Approximately 45 minutes to one hour later, "we get a call from Dispatch that says that someone's recovered a child at the Cornerstone of Recovery on Alcoa Highway, that was left in the parking lot." The baby was "left in a car seat in the parking lot there." An officer sent Sergeant Boyd a photograph of the child, and Terri Fox, a friend of the victim's, identified the child as J.L.

During cross-examination, Sergeant Boyd testified that Mr. Lett, smelling of alcohol, arrived at the scene 45 minutes to one hour after Sergeant Boyd arrived. Sergeant Boyd said that he had previously responded to "a couple of calls" to the victim's house, noting, "I think she had an issue with a neighbor . . . ." Sergeant Boyd did not know to whom Mr. Lett referred when he said, "He killed her."

BCSO Lieutenant Danny Wilburn testified that the defendant, who was wanted for questioning in this case, had been arrested in Colorado on August 25, 2011. Lieutenant Wilburn notified Detective James Trentham of this information.

Agent Pat Crouch of the Colorado Bureau of Investigation ("CBI") testified that Detective Trentham contacted him on August 26, 2011, and asked him to interview the defendant. Agent Crouch said that he received a three-page report from BCSO to aid him in the interview, but, because he "was real short of details," he did not conduct a full interrogation. He interviewed the defendant on August 26, 2011, at 2:00 p.m., providing him with *Miranda* warnings and having him sign a written waiver of rights. Agent Crouch kept the interview "[r]eal easygoing, really kind of casual" because he "wanted [the defendant's] cooperation and I wanted to get a statement from him." His intent was to "[j]ust try to lock [the defendant] into a story or a statement as to his possible involvement in a fire or homicide that occurred . . . in Blount County." The jury watched a video recording of the interview. Agent Crouch said that the defendant told him that he believed Rhonda Miller was responsible for the fire and that he "without a doubt . . . saw Rhonda Miller exit that house." The defendant told Agent Crouch that he was sleeping on the couch in the living room when he heard an explosion and went to the victim's room and that he "called out for" her in the dark but "got no response." The defendant admitted to owning "a Glock .40 caliber pistol, a Franchi shotgun, and a Rossi .38." The defendant permitted

-4-

Agent Crouch to photograph his injuries, which photographs were exhibited to Agent Crouch's testimony. Agent Crouch noted that the defendant had what appeared to be burn injuries to his right armpit, lower legs, and hands.

On cross-examination, Agent Crouch testified that the defendant told him that he had sold or traded all of his guns and did not have any firearms the day of the fire. He said that the defendant was cooperative. Agent Crouch acknowledged that the defendant had a "[r]eal light burn injury" to his ear, which Agent Crouch did not photograph.

Ty Lett, the victim's son, testified that he had lived with the victim, who owned a children's consignment shop, for eight years. J.L., Mr. Lett's niece and the victim's granddaughter, also lived with the victim, and Mr. Lett and the victim shared custody of J.L. Mr. Lett said that he had known the defendant "[o]ff and on for years." The defendant stayed at the victim's house for 15 to 30 days in June 2011. At first, Mr. Lett believed that the victim was just helping out the defendant, but "then I seen it went a little further than that" when he discovered the victim and defendant together in the victim's bed watching television. He said that a few days before the fire, the defendant and victim argued, and the defendant began sleeping on the couch. Mr. Lett described the layout of the house, noting that there were two front doors, one leading into the victim's bedroom and the other leading into the living room. An exterior door on the back of the house led into Mr. Lett's bedroom. Mr. Lett said that the victim drove a 1999 Chrysler Sebring LXI that "was her baby and no one was allowed to drive that car at all." When the defendant had asked to drive the car, the victim had said no.

Mr. Lett said that he and the defendant were in the process of building a fence and that the defendant was supposed to help him with the project on June 19 but that it rained off and on throughout the day. Although Mr. Lett worked on the fence in between the rain, the defendant would not help. That morning, the defendant had been "upset because my mom didn't make him pancakes like she did for [J.L.] and herself. . . . And it came down to, well, if you don't help around the house, I'm not making you nothing." That same day, Mr. Lett and the victim discussed "hav[ing] the defendant removed out of the house."

Mr. Lett testified that he went to the house of his friend, Charles Hatcher, for dinner on June 19 and that the two later went to Shooters bar to play pool. Mr. Hatcher picked up Mr. Lett from the victim's house that evening and later drove him to Shooters, which was approximately one-quarter mile away from the victim's house. Mr. Lett said that he arrived at Shooters between 8:30 p.m. and 9:30 p.m., where he met Trena Baker. At approximately 12:30 a.m., Mr. Hatcher drove Mr. Lett and Ms. Baker to the victim's house so that Mr. Lett could get his Jeep and return to Shooters. Mr. Lett saw the victim's

car in the driveway at that time but noticed that it was parked "[i]n an odd position." The defendant was in the front yard and told him to leave the victim "alone right now. Because she could have a temper." Mr. Lett and Ms. Baker walked to the back of the house to Mr. Lett's bedroom where they remained for less than a minute. When they left the room, Mr. Lett saw "the front of [the defendant's] bald head sticking around the corner of the house, peeking at me." By the time Mr. Lett reached the corner of the house, the defendant "was like some 15 foot down, like he just -- I don't know why he ran down that way and came back." Mr. Lett and Ms. Baker returned to Shooters in Mr. Lett's Jeep and remained there until approximately 2:30 a.m. As they were driving back to the victim's house, Mr. Lett saw fire trucks and police cars in the road and saw black smoke coming from the victim's house. Mr. Lett said that when he saw the smoke, he "[f]reaked out." He said that his first thought was that the fire may have been set by a man who had previously assaulted the victim and had recently been released from prison. Mr. Lett acknowledged that he had been drinking and driving that night.

Mr. Lett testified that he called Terri Fox, the victim's close friend who had helped the victim raise J.L. Ms. Fox's father was retired from the BCSO, and Mr. Lett hoped that "she could find out what was going on." Mr. Lett parked his Jeep in a nearby driveway, and when Ms. Fox arrived, he rode with her to the victim's house. Mr. Lett said that he worried that the victim and J.L. were inside the burning house. When he learned that a body had been found, he "tried to get away and run up to the house in another direction." Mr. Lett said that he had previously given the defendant a tattoo in exchange for a 20-gauge shotgun.

Mr. Lett identified photographs of the victim's jewelry boxes, satin jewelry bag, laptop, recycling bag, and luggage that had been recovered in this case. He explained that the victim kept "[a]ll of her gold" and her jewelry in the jewelry boxes and satin bag, which she carried around inside the recycling bag because she "didn't want to leave" her jewelry "at the house all the time. Sometimes she put it in the trunk of her car." She used the recycling bag to avoid drawing attention to her "carrying something important." Mr. Lett also identified photographs of a flashlight and power drill that he ordinarily kept in his Jeep and a cigar box in which the defendant "kept ammunition" and "[t]he silver Rossi with the walnut handle." Mr. Lett said that "[t]hree Emmett Kelly clown paintings by Rust, the artist," were missing from the victim's living room. Mr. Lett testified that he knew the paintings to be valuable because "I was a custom art framer in Sarasota, Florida" and because the paintings were verified by the Smithsonian. He noted that other pieces of artwork also appeared to be missing from the victim's house. Mr. Lett acknowledged that he had a criminal history, including convictions for burglary, theft, and forgery.

During cross-examination, Mr. Lett testified that J.L., who was the child of Mr. Lett's sister, Shannon Lett, was under two years old at the time of the fire. He

explained that Ms. Lett did not have custody of J.L. because of a drug addiction. Mr. Lett acknowledged that he had been convicted of multiple thefts, violations of the Habitual Motor Vehicle Offender ("HMVO") law, and the sale of cocaine and other controlled substances. Mr. Lett said that he got along with the defendant and that he did not complain to the victim about the defendant because the victim owned the house and "[h]er matters were her matters and I stayed out of them."

Mr. Lett acknowledged that the victim had a temper but said that her "temper was with her tongue," noting that she had a "very educated tongue. She could be sharp with you." He said that the victim was bipolar, and "[i]f you crossed her, then it was a problem" but denied that the victim started arguments. He acknowledged that the victim had previously pulled a gun on him but explained that "I had that coming" because "she wanted me to get off of drugs. Because I had been dealing and I got those charges . . . . She was trying to talk sense into me." Mr. Lett said that the victim had caught Ms. Lett stealing from the victim's house in the past and that, although Ms. Lett was allowed at the victim's house, the victim did not permit Ms. Lett to be left alone. Mr. Lett testified that the victim "feared everybody" and that she kept "[a]ll of her retirement in those [jewelry] boxes." He recalled an occasion on which the victim's neighbor, Clarence Marley Cooper, shot at the victim's house but acknowledged that Mr. Cooper was in prison at the time of the fire.

Mr. Lett testified that he had heard "arguments and disgruntlements" between the victim and the defendant but said that he always walked away during those incidents because it was "my mother's business." He believed that the victim was happy with the defendant living in her house "[u]ntil she and I had a conversation." He said that one week prior to the fire, he and the victim discussed moving to Key West, Florida. Mr. Lett explained that he and the victim flipped houses together and that they would have had to flip a house to be able to afford a move. The defendant had promised the victim that he would "help flip and remodel a house" so that the victim could move to Florida.

Mr. Lett said that the victim's car had been damaged in a hail storm sometime prior to the fire and that the car had been deemed totaled by the insurance company. Mr. Lett acknowledged that he drove his Jeep for work, to Shooters, and "[t]o go fishing" despite his not having had a valid driver's license in over 10 years. He said that he got the shotgun from the defendant for the victim because "[s]he was afraid of [Mr.] Cooper getting out of prison and assaulting her again." Mr. Lett acknowledged that he had felony convictions that made it illegal for him to possess a firearm but said that he did not possess the shotgun, explaining that he only used it to shoot in "the back yard, up towards the hill, because it was private property." Mr. Lett said that he did not receive the victim's autopsy report but acknowledged that he may have told Ms. Lett that the victim had been shot based on the neighbors' reporting that "they heard firings of guns" and the fact that any gunshots

"would had to have" struck the victim.

Mr. Lett explained that he did not immediately drive up to the victim's house when he saw the smoke "[b]ecause I didn't have a license." He parked his Jeep, called Ms. Fox, and rode with her to the house. He acknowledged that he knew the victim and J.L. were inside the house at the time he saw the smoke because the victim "didn't go out at night." He estimated that he had had six or seven beers that night.

Terri Fox testified that she first met the victim in 2009 and that she and the victim became "very close" friends. Ms. Fox said that she and her husband had adopted J.L. after the victim's death. Prior to the victim's death, Ms. Fox regularly watched J.L., and, on June 19, she kept J.L. until the victim got off work. At 11:15 p.m. that night, Ms. Fox received a telephone call from the victim, and the victim had told her that J.L. was in bed. Ms. Fox said that Mr. Lett called her at 3:00 a.m. and that she went to meet him "at the bottom of the road there on East Cumberland." She said that from there, she and Mr. Lett "walked up to the scene." When officers told them that someone had been found inside the house, she assumed it was the victim, and Mr. Lett became "very upset." Ms. Fox said that she had never met the defendant but that the victim had told her that the defendant was helping out.

During cross-examination, Ms. Fox acknowledged that the victim had never said anything bad about the defendant. She said that the victim "seemed fine" during their telephone conversation on June 19. When Mr. Lett called her, he told her "that there was something going on and wanted me to come to him." She reiterated that she and Mr. Lett walked up to the victim's house.

Trena Baker testified that she first met Mr. Lett on June 19, 2011 at Shooters. She and Mr. Lett began "flirting with each other," and she left the bar with Mr. Lett, Mr. Hatcher, and Mr. Hatcher's wife to go to pick up Mr. Lett's Jeep. When they arrived at the victim's house, a man was outside and told them "not to go into the house because he didn't want us to wake [the victim] and the baby up." She and Mr. Lett went to Mr. Lett's room through a back door, and when they came back outside, the man was "right around the corner" of the house. She and Mr. Lett went back to Shooters in Mr. Lett's Jeep. When they returned to the victim's house, they saw emergency personnel, and Mr. Lett "pulled into a parking spot because he didn't want to pull up there driving" because "we had been drinking and he didn't have a license." She said that they walked to "a house at the bottom of the hill" where they stayed until they "could find out what was going on." Mr. Lett called Ms. Fox who told him that the victim's house was on fire. Ms. Baker estimated that Ms. Fox arrived within 15 minutes and drove Mr. Lett to the victim's house.

On cross-examination, Ms. Baker testified that she had gone with Mr. Lett to

the victim's house for Mr. Lett to show tattoo artwork to her. The man that she saw outside the house did not do anything unusual and did not try to stop them from entering the house. She said that she and Mr. Lett left Shooters the second time at 2:00 a.m. or 2:30 a.m. and that she stayed with Mr. Lett after seeing the smoke because "I didn't know what to do." Ms. Baker said that she had consumed alcohol "[h]ere and there" throughout the night, drinking "[m]aybe a twelve pack" of beer. She said that Mr. Lett was also drinking and acknowledged that he was drunk when they saw the smoke at the victim's house.

Charles Hatcher testified that he had driven Mr. Lett to Shooters on the night of the fire. He said that he did not drink at all that night and that Mr. Lett drank "a little bit." Mr. Hatcher then drove Mr. Lett and "his girl" to the victim's house and dropped them off. Mr. Hatcher said that before he drove away, he saw the defendant "[c]oming out the front door" of the house. He received a call from Mr. Lett later that night about the fire, and he came to the scene and saw that Mr. Lett was "[h]ysterical. He was freaking out."

Mr. Hatcher testified that one or two days before the fire, he was with Mr. Lett and the defendant in the victim's back yard when they "[m]ade a couple of bombs," one using a Coke bottle with "black powder" and the other using a pipe with "white stuff." Both bombs had a wick fuse. Mr. Hatcher said that he set off the bottle bomb first, which explosion caused "a loud bang" and that the second bomb was louder. He acknowledged that he did not see the defendant make the bombs.

During cross-examination, Mr. Hatcher said that he had met Mr. Lett three to four years earlier, playing pool at Shooters. He said that he picked up Mr. Lett on June 19 and drove him to Mr. Hatcher's house for dinner where they ate and watched a movie. Later they went to Shooters. Mr. Hatcher said that when he found out that the victim's house was burning down," he drove back to the area and picked up Mr. Lett "down at the bottom of the road" and drove him back to the victim's house after he and Mr. Lett gave statements to the police. He said that the bombs that they had set off in the back yard each exploded within two to three seconds of the fuse being lit and that neither bomb caused much damage. He did not think that their setting off the bombs was anything unusual.

Josh Dunn testified by audio recording by agreement of the parties. He said that he worked as a night shift counselor at Cornerstone of Recovery in June 2011. Mr. Dunn described events that occurred in the early morning house of June 20, 2011:

> I'd heard a noise outside the building. . . . I walked outside to see what it was and I saw headlights down on the building on the other side of my truck. . . . The headlights started backing up, so I started making my way down there.

I rounded my truck, saw a car pulling out to leave. And I was looking at my truck, looking at the car, looking at my truck, looking at the car. And then I started looking at the car more, thinking I probably need to get a plate number. As I make it just past the cab of my truck, I heard, "Mama," come from the back of my truck. I looked over and there was a baby in my truck, reaching for the car that was leaving.

All my focus then took place on the child to comfort her, because you could see just terror on her face because she didn't know who I was. I had never seen her before.

Mr. Dunn described the car as "a white two-door car" that he was "[p]retty sure . . . was a Chrysler Sebring." He saw only one person in the car but could not tell if it was a man or a woman. He said that he found the baby "[i]n the bed of my truck, behind the toolbox" and that she "[w]asn't hardly buckled into her seat." He said that the baby seemed "pretty frightened at first." He picked her up with the car seat and took her in "to the main office of Cornerstone." He said that other than being scared, the baby "was real calm." In the office, he removed her from her car seat, "[a]nd she seemed pretty fine after that." He had an associate call the police, and when they arrived, he told them everything that had occurred. He said that he did not get a license plate number from the white car.

During cross-examination, Mr. Dunn said that his truck was parked four to five parking spaces away from the door to the building. The first sound that he heard outside was "a car door." He said that he "poked my head out the door to see what it was" when he "saw the headlights and all that." Because the vehicle was behind his truck, he did not see it "until it backed out." He said that he was "apprehensive about walking out there" but "started making my way down there" when the car backed out. He said that the white car left the parking lot "at a pretty slow rate of speed."

Alcoa Police Department Sergeant James Sparks testified that he responded to Cornerstone of Recovery to a call of "an abandoned child in the back of a pickup truck" at 1:36 a.m. on June 20, 2011. He met with Mr. Dunn, who told him that "someone had left a child in the back of his pickup truck in a car seat." Sergeant Sparks identified the child from a photograph. He said that he first checked out the baby to see if "there was anything that would identify her, but there wasn't." He then advised the surrounding agencies that he had recovered a child. Deputy Scotty Boyd of the BCSO contacted him about a child that was missing from the scene at the victim's house. Sergeant Sparks sent Deputy Boyd a photograph of the baby, and Deputy Boyd "advised that that's the child that they were missing on their scene." At that point, the Department of Children and Family

-10-

Services took custody of the baby.

Rhonda Miller testified that she had been in a relationship with the defendant that ended badly in April 2011. She said that she lived in Claxton with several family members and had never come to Blount County. She described herself as five feet, three inches tall.

Les Stiers testified that he was the mayor of Jellico in June 2011. He said that he daily went "around in my city" to "look at" what things needed repair or attention. One day in June 2011, he was riding with his wife and grandson when he "noticed something . . . off to the edge of the road" along Douglas Lane near the Jellico Motel. Thinking that it was litter, he got out of the car and went to pick it up when he discovered that it "was a leather duffel bag, kind of a suitcase bag" lying "behind a post in the grass." He did not find any identification in the bag and put it in the trunk of his car. When he arrived home, he "dumped the contents" of the bag onto his driveway and found a pair of shoes, shorts, a Miami Dolphins jersey, and three license plates "folded longways." He recognized one of the license plates as one that had been shared on an all-points bulletin on television. He called Officer Joe Hopson to collect the items.

During cross-examination, Mr. Stiers testified that he found the bag on June 20 and that he had seen the license plate on television that same morning. He said that the bag was approximately 250 feet away from the Jellico Motel and was behind "a short pole with some kind of cable marking."

Joseph Hopson, who had worked as an officer with the Jellico Police Department in June 2011, testified that Mr. Stiers reported finding "a black duffel bag" with several license plates inside and that "one of the tags came back to a . . . Chrysler vehicle" that was "wanted in connection with a homicide in Blount County." Officer Hopson responded to Mr. Stiers' house and collected the items. He inventoried the contents of the bag and released the items to the BCSO on June 21, 2011. He also responded to the Jellico Motel "[t]o see if this individual in question had stayed at the hotel." He discovered that one man had checked in the night before and that the man had abandoned property in room 108. He collected several items from the motel, including "a black piece of luggage" and a cigar box containing .38 caliber shells. He turned these items over to the BCSO as well.

On cross-examination, Officer Hopson testified that the motel room was "in decent shape" and that the beds had been made. He said that he collected all of the evidence from the motel on June 20 and did not remove anything from the black suitcase. He also said that none of the shells found in the cigar box had been fired.

-11-

Joseph Ivey, an employee of the Jellico Motel, testified that he checked in a man at 3:59 a.m. on June 20. He explained that the registration slip listed the date as June 19 because it was motel policy to use the prior day's date for any check-in before 6:00 a.m. Mr. Ivey said that the man was alone and was driving a white car. Mr. Ivey identified several photographs of the motel.

During cross-examination, Mr. Ivey testified that the front office of the motel looks out over the parking lot and that he did not see the man leave the motel after checking in. Mr. Ivey identified the defendant as the man that he had checked into the motel on the morning of June 20. He said that housekeeping began cleaning rooms between 8:00 and 9:00 a.m. and that room 108 would have been cleaned sometime Monday morning. He said that he did not enter room 108 after the defendant had gone.

On redirect examination, Mr. Ivey said that he had not been looking out of the office window or watching the parking lot and would not necessarily have known if the defendant had left the room at some point.

Andy Waters, a crime scene investigator with the BCSO, testified that he responded to the victim's house the day after the fire to assist in the investigation. He photographed the scene and collected "anything he found of evidentiary value." He said that the license plate number registered to the victim was 915-NTK.

On cross-examination, Officer Waters testified that he did not find any firearms in the house but found .38 caliber shells in the living room, none of which had been fired. He said that he did not attempt to collect any fingerprints from items "[b]ecause there was tons and tons of water that had been issued trying to put the fire out of the house so it was all contaminated." He also said that he did not seek any DNA analysis in this case.

BCSO crime scene investigator Neal Porter, who acted as the lead investigator in this case, responded to the fire at the victim's house. At that time, he did not know that the victim was inside. He began by taking photographs of the outside of the residence. He then learned that firefighters "had found a body inside the house." Investigator Porter said that he responded to the Jellico Motel on June 21, where he photographed the motel and the contents of a trash can, including a "white and green shopping bag," jewelry boxes, a pink cloth bag, a white tank top, a broken laptop, and a cigar box with mixed brands of .38 special ammunition. He said that the jewelry boxes were empty. He sent the white tank top to the Tennessee Bureau of Investigation ("TBI") laboratory for testing. Investigator Porter also examined the items found in the black duffel bag, including a Miami football jersey, camouflage shorts, car tags, hygiene items, boxer shorts, a tag from Wrangler shorts, a Verizon phone card, the "top part of a laptop

-12-

computer," and a receipt from a Walmart in Clinton indicating a time of 2:47 a.m. on June 20, 2011. In the black suitcase recovered from the motel, Investigator Porter found various items of men's clothing and a set of keys that went to the victim's children's consignment store. Investigator Porter said that he went to Indiana where Indiana State Police had recovered the victim's car at a casino. He photographed the car and inside found an Oklahoma license plate, cordless drill, screwdriver, flashlight, sunglasses, road atlas, and a "boonie-style military camouflage hat."

During cross-examination, Investigator Porter said that he collected "a little sawed-off, single shot shotgun" from between the mattress and box spring in Mr. Lett's bedroom. He said it was not a legal firearm "[b]ecause the barrel has been cut off and it's too short overall length." He explained that he did not test the gun for fingerprints because Mr. Lett had already admitted to having it and that he would assume Mr. Lett's fingerprints to be on it. He said that he did not find any fingerprints on the cigar box or the license plates. He sent the tank top and a towel found in the trash can at the motel to the TBI laboratory for DNA analysis.

Investigator Porter said that the victim's car was found in Indiana "several months" after the victim's death and that Indiana police had secured the vehicle but had not searched it. He said that the only jewelry recovered in this case was that found on the victim's body during the autopsy.

Kenneth Brian Charles, a loss-prevention employee at the Clinton Walmart, testified that he collected video security footage from the store on June 20, 2011, and the jury viewed the video recordings. He explained that the video was a compilation of different camera angles and that it did not have audio. He said that still photographs taken from the video footage showed a man in the electronics department of the store at 2:47 a.m. He identified a Walmart receipt as having originated from his store, which receipt indicated the purchase of "a prepaid phone," a Verizon "card that would put the minutes onto that phone," "disposable razors," "six-inch plier[s]," "a screwdriver, a knife, a pair of Wrangler shorts, shave gel, and . . . a T-shirt."

During cross-examination, Mr. Charles said that certain parts of the store were not covered by security cameras and that, consequently, the video has "certain parts that you wouldn't see what was going on."

TBI Special Agent and Forensic Scientist Keith Proctor testified as an expert in serology and DNA analysis. In this case, he tested a tank top shirt on which he found the defendant's DNA. He also found a DNA profile on a towel but was able to exclude the defendant and the victim as contributors. On cross-examination, Agent Proctor acknowledged that the towel was presumptively positive for human blood.

-13-

Andy Howdeshell, an employee with the BCSO testified that as he escorted the defendant out of the courtroom after the deposition of State witness Kenny Kalabhai[4] in October 2015, the defendant told him that "he knew the witness wasn't going to say anything" and that the witness "knew exactly who he was." Mr. Howdeshell said that he did not ask the defendant any questions but that the defendant volunteered the information.

Detective Mike Seratt of the BCSO Investigation Unit testified as an expert in fire and arson investigation. He said that fires are categorized as accidental, natural, incendiary, or undetermined. Detective Seratt responded to the victim's house at 3:00 a.m., after the victim's body had been found. He determined that the fire was concentrated in the garage area and the victim's bedroom. The rafters in the bedroom were "totally . . . burned out and . . . collapsed in th[e] bedroom area." He said that the victim's bedroom had "no roof left" and had "sustained very heavy damage." He explained to the jury that photographs of the scene showed wood pieces with pyrolysis, also known as "alligatoring," that was the result of the fire burning up all of the oxygen in the wood, which indicated to him where there had been "a lot of flame and heat in those areas."

He determined that the fire started in the garage and moved to the victim's bedroom. He examined the breaker box and each room in the house and found no evidence that the fire started in any other area. Although the fire was concentrated in the garage and the victim's bedroom, Detective Seratt said that no one would have been able to survive had they been in Mr. Lett's bedroom at the time because the room "would be totally engulfed in smoke. You would not be able to breathe and you would collapse at some point." The door between the victim's bedroom and the living room had "some alligatoring" and that that area was "charred." The living room sustained smoke damage from "heavier smoke." Because the walls of the living room had consistent coverage of smoke residue, Detective Seratt said that no paintings would have been hanging on the walls at the time of the fire. He noted that firefighters can cause significant damage in fighting fire, noting that their job is to rescue victims and extinguish the fire and not to preserve evidence.

Detective Seratt testified that he searched the victim's bed for bullets but that he did not expect to find any because the "heat would have reached temperatures . . . [of] fourteen to fifteen hundred degrees and it's going to melt lead at that point." He said that he did not find any "pour pattern" on the floor of the victim's bedroom, the presence of which would have indicated "any type of ignitable liquid" that had been poured and had seeped through to the floor. Laboratory testing of floor samples confirmed that no accelerants were present on the floor. Detective Seratt explained that accelerants were not

---

[4]     Mr. Kalabhai's testimony was presented to the jury via a video-recorded deposition by agreement of the parties, but a transcript of the deposition is not included in the record.

necessary, however, for the fire to spread because "you've got a heavy fuel load" in the room, including "any type of furniture, boxes, books, newspaper, anything . . . . that's a wood product or paper product." In the garage area, he found a propane tank with the top valve blown off, but he eliminated the tank as a cause of the fire. He also examined a light fixture that had fallen from the ceiling of the victim's bedroom and wires sticking out of a wall and eliminated each of those as a source of the fire. He testified that he identified a storage area between the garage and the victim's bedroom as the area of origin of the fire but said that he was unable to pinpoint a more specific point of origin. The storage area contained paintings, tools, and several accelerants, such as paint thinner. Detective Seratt also noted that the garage contained several flammable liquids.

Detective Seratt testified that he collected "plastic material that was used that had some type of ignitable material in it, possibly gunpowder" and "a piece of metal piping with an end cap" from a "round concrete table" in the backyard. He explained that the plastic bottle and metal pipe could be made into bombs by "put[ting] a gunpowder substance or fertilizer with some type of kerosene or something like that inside . . . of them and put[ting] an end cap on it." He said that, had a plastic bottle bomb been used to start the fire in this case, he would not expect to find any remnants of the plastic because the plastic "would dissipate, it would . . . be melted totally." On the other hand, if a metal pipe bomb had been used to start the fire, "you possibly could find" remnants.

Detective Seratt said that he initially classified the fire in this case as undetermined but that, "several months" after the fire, "after getting all the facts of the case, throughout interviews and all the evidence," he concluded that the fire was incendiary. He said that "[c]rime concealment" is one possible motivation for arson.

During cross-examination, Detective Seratt testified that he found no evidence of an accelerant in the victim's bedroom or on her body. He explained that he classified the fire as incendiary because he had eliminated "all electrical points" as a potential cause of the fire and because "there was no other reason for the fire to have started." He concluded that "[i]t was a set fire" and that it was set "in the garage area, near that storage area." He found no evidence, however, that a bomb was used to start the fire. He determined that the fire was set with "an open flame," meaning "any type" of open flame, such as a lighter or a match. He acknowledged that the garage had ignitable liquids, including "gasoline, kerosene, things of that nature" but noted that these items "would be standard for people to put . . . in a garage."

Detective Seratt said that he did only "a brief examination" of the victim's body at the scene because the body was going to be autopsied. Because the body "had so much burn damage," he "could not really tell anything about the victim" and did not know that the victim had been shot until after the autopsy. He recalled that the victim had on "a

-15-

ring and a necklace" at the time of her death. He said that he did not fingerprint the victim's car because the defendant had already admitted to having driven the car.

Jody Smallwood testified that the defendant had told him that he had argued with his girlfriend about his girlfriend's son and that the defendant "remembered shooting her twice." He said that the defendant also told him that "he burned his leg real bad in the fire and he saved a little girl from the fire. He said he pulled a little girl from the fire and took her up the road and dropped her off." The defendant told Mr. Smallwood that he had left the victim's house in the victim's car, had taken "some paintings," and "went up through Kentucky and Indiana, up that way. Stopped at a Walmart and he stayed in a motel somewhere up that way," ending up in Colorado. Mr. Smallwood said that the defendant told him that the gun "wouldn't be found" but did not otherwise say where it was.

During cross-examination, Mr. Smallwood testified that he talked to the defendant when they shared a cell at the Blount County jail approximately two years before trial.

BCSO Detective James Trentham testified that he responded to the fire at the victim's house after being notified that the victim's body had been found. At the scene, he began "trying to interview and take information from different individuals." He did not learn that the victim's death was a homicide until the next day at the autopsy when it was discovered that the victim had four gunshot wounds. Although the victim was not positively identified at the autopsy, Detective Trentham believed it to be her because of certain "articles and stuff that was on [her] body."

Detective Trentham said that he was able to eliminate Mr. Lett and Ms. Lett as suspects and put out a "be on the lookout" notice for the defendant. He interviewed several of the defendant's contacts in the area but did not locate him. He said that Mr. Cooper was not a suspect because he was incarcerated at the time. At some point, Detective Trentham learned that the defendant had checked into the Jellico Motel under a false name. He said that the four rounds of ammunition collected from the victim's living room were of the same caliber and mixture of brands as the ones found in the cigar box. He said that the man seen in the Walmart surveillance video was wearing the same Miami Dolphins jersey, camouflage shorts, and boonie cap that were recovered from the black duffel bag and the victim's vehicle. Among the items purchased at Walmart was a screwdriver, and Detective Trentham noted that most license plates are attached to vehicles with a "screwdriver or some type of tool."

Detective Trentham testified that approximately two months after the fire, Colorado State Police contacted him to report that the defendant was in custody. Detective Trentham traveled to Indiana, where the victim's car had been found and, on September 1,

2011, went to Colorado to interview the defendant. During the first interview, Detective Trentham "want[ed] to befriend him, make him feel . . . that everything is good," stating, "I'm not really going to ask him any questions. I'm just going to allow him to provide a statement." Detective Trentham believed that the interview was being audio and video recorded but later discovered that it was not. He said that the defendant told him that he had been at the victim's house, "asleep on the sofa," when he was woken by gunfire. The defendant also told him that he had abandoned the victim's vehicle and had lost the keys. The defendant accused his ex-girlfriend, Ms. Miller, and "[s]ome unknown black male" for the victim's death.

Detective Trentham interviewed the defendant a second time on September 2, 2011, but gained "[v]ery little" new information. He interviewed the defendant a third time on April 10, 2012, after the defendant had been transferred to Blount County. Detective Trentham said that he provided the defendant with *Miranda* warnings and that the defendant agreed to speak with him. The jury viewed a video recording of that interview, in which the defendant denied that he and the victim had had an argument the morning of the fire and said that he and the victim had planned to move to Key West, Florida together. He told Detective Trentham that he had been asleep on the couch in the living room of the house when Mr. Lett called him, waking him up. He then heard Mr. Lett's Jeep approaching the house, and the defendant went out to the front porch where he saw Mr. Lett and a woman get out of the Jeep. The defendant said that Mr. Lett left a few minutes later, and the defendant went back to sleep. At some point, he was woken by what he believed to be gunshots. He went into the victim's bedroom, which was very dark, and called out to her. He then walked toward the door leading to the garage through which he saw the silhouette of a woman and a man leaving the house. He believed the woman to be Ms. Miller. The defendant said that as he reached for the door, an explosion occurred, causing burns to his body. He remembered crawling across the floor toward the living room but claimed to have no memory of the events between the explosion and his being at the Jellico Motel.

During cross-examination, Detective Trentham testified that a Colorado officer had interviewed the defendant once before Detective Trentham arrived. He acknowledged that not everything that he said to the defendant during the interviews was true but explained that he had been taught to interview in that way "to try to see if you can get additional information, keep the person talking."

Detective Trentham said that other witnesses confirmed the alibis of Mr. Lett and Ms. Baker but he acknowledged that he did not talk to anyone else who had been at Shooters that night other than Mr. Hatcher. Detective Trentham did not try to get fingerprints from the shells found in the victim's living room because the fire department had done "a total wash-down of the house," and "there was a lot of evidence destroyed not

-17-

only by the fire but also by the Fire Department and the water." He did not have the shells found in the cigar box fingerprinted because they were not found at the house and because he learned that it was very difficult to get fingerprints from .38 shells. He explained that he did not have most pieces of evidence tested for DNA because "[w]e knew who the items belonged to" and that finding traces of the defendant's hair or DNA on the items "would not have advanced the investigation."

Doctor Steven Cogswell, the Deputy Chief Medical Examiner at the Hamilton County Regional Forensic Center in Chattanooga, testified as an expert in forensic pathology. Doctor Cogswell, who worked at the Knox County Regional Forensic Center at the time of the victim's death, performed the victim's autopsy. He said that although the victim was severely burned, "there's still a whole lot of information that can be told from autopsy" and that he did not consider the victim's burns to be a hinderance to his examination. Because the victim's identity could not be established by her appearance, he identified her from extensive dental records.

Doctor Cogswell determined that the victim's burns were sustained post-mortem and that "she was actually dead before the fire started." He concluded that the cause of death was "[m]ultiple gunshot wounds." He discovered four gunshot wounds on the victim, all of which "went through the body entirely with no bullet retained in the body." The victim had one entrance wound "in the head, . . . two in the chest and one in the arm." Based on the nature of the gunshot wounds, he opined that they were caused by a firearm "of some relatively sizeable power. You're dealing with probably what we would consider a major caliber handgun. Not so much as a rifle. There's not quite enough damage for that." He said that the victim's gunshot wounds could not have been caused by a 20-gauge shotgun but that they were "very consistent" with .38 special bullets.

Doctor Cogswell explained the difference between flash burns and splash burns, saying that a flash burn results when a "cloud or mist" of fuel is ignited and "[t]he whole thing goes off at once and it forms a fireball. And that fireball, when it strikes someone, will cause a burn on the surface" of the body facing the fireball, but areas not facing the fireball "are protected or spared." A splash burn, on the other hand, results from a "flammable liquid being dumped or spilled" that "splashes on the body" and when ignited, "you're going to see a pattern that will follow the liquid, essentially." He added, "You can see how the liquid runs down the body under the force of gravity. And if there are areas on the clothing that stop it from running like, say, for example, a belt or a sleeve cuff, the liquid will tend to collect there and spread out. Looking at photographs of the defendant's burns taken after his arrest, Doctor Cogswell concluded that the injuries followed "a splash burn pattern." He pointed out "splash burn pattern healing injuries along the lower leg and ankle and the top of the foot" and another pattern "running down the back of the leg and also on the ankle and again stopping at the level of where a shoe

would be." He described a burn to the defendant's foot as "a very localized area of injury that has that flow pattern that you see with splash burns."

During cross-examination, Doctor Cogswell testified that he did not recall any specific jewelry that he removed from the victim during autopsy. He acknowledged that the victim's gunshot wounds could have been caused by a variety of caliber ammunition but maintained that the wounds were likely caused by a handgun or pistol. He said that he did not find any accelerant on the victim's body. Doctor Cogswell conceded that he never examined the defendant's burns in person but said that the photographs were "pretty clearly lit" and that he did not have difficulty seeing the burn patterns.

The State rested and, after a full *Momon* colloquy, the defendant elected not to testify but did choose to put on evidence.

Special Agent Daniel Foster of the State of Tennessee's Bomb and Arson Section, testified as an expert in cause and origin of fire and in K-9 arson investigation. He said that he routinely assisted other law enforcement agencies or fire departments in determining "the cause and origin of a fire or an explosion or recovery of explosives." His K-9 dog, Nani, "specializes in finding evidence related to ignitable liquids, any type of accelerant that might be used in setting a fire, such as gasoline, lamp oil, [or] lighter fluid." Agent Foster responded to the victim's house on June 20, 2011, at the request of the BCSO. He had Nani enter the burned house "to let her search" and "do a sweep of the structure to see if we could find any ignitable liquids." The dog searched the victim's bedroom and the victim's body, which was still at the scene, but the dog did not indicate the presence of any ignitable liquid.

On cross-examination Agent Foster testified that he was not asked to do a complete investigation into the cause of the fire in this case. He said that he did not have Nani search the garage because he would expect the dog to alert to accelerants in the garage, explaining that "if a vehicle parks in the garage pretty regular, there's a good chance it has leaked some oil, it has leaked maybe some gasoline, but some type of petroleum product has leaked from the vehicle. Also, people put their gas containers in the garage, their paint thinner, the utility room." He acknowledged that an accelerant could have been used to start the fire in the victim's garage. He also acknowledged that arsons can be used as an attempt to cover up other crimes, and, in the case of a gunshot victim, the arson could conceal the gunshots, blood, DNA, fingerprints, and other evidence.

The defense rested.

On this evidence, the jury convicted the defendant of the lesser included offense of second degree murder, especially aggravated kidnapping, theft of property

-19-

valued at $500 or less, arson, and abuse of a corpse. After a sentencing hearing, the trial court imposed an effective sentence of 58 years' incarceration. Following a timely but unsuccessful motion for a new trial, the defendant filed a timely notice of appeal.

In this appeal, the defendant argues that the trial court erred by denying his motion to suppress his April 10, 2012 statement and by admitting certain evidence in violation of Tennessee Rule of Evidence 404(b).

### I. Motion to Suppress

Prior to trial, the defendant moved to suppress his April 10, 2012 statement, arguing that Detective Trentham questioned him after he had invoked his right to counsel.[5]

At the August 5, 2015 hearing on the defendant's motion, Detective Trentham testified that while investigating the fire, he was initially unable to locate the defendant and learned that the victim's vehicle was missing from the scene. After seeing the defendant driving the victim's vehicle on security footage from Walmart, he obtained a warrant on June 21, 2011, for the defendant's arrest for the theft of the victim's vehicle. Two months later, on August 25, he learned that the defendant had been arrested in Colorado on unrelated charges. The next day, he spoke with Agent Crouch and asked him to visit the defendant "and see if [he] would like to speak with him or someone from Tennessee." Detective Trentham sent Agent Crouch "a copy of our initial report," and Agent Crouch met with the defendant. Detective Trentham then traveled to Colorado on September 1 and met with Agent Micciche of the CBI and officers from the Huerfano County Sheriff's Office to discuss what information they had gleaned from the defendant. Before questioning the defendant, Detective Trentham reviewed the *Miranda* warnings and obtained the defendant's signature on a Blount County waiver of rights form.

On September 2, Agent Micciche again provided the defendant with *Miranda* warnings and administered a polygraph examination; the agent stayed in the interview room during Detective Trentham's subsequent interview. Detective Trentham explained that he did not provide additional *Miranda* warnings at that time because there had been no break in the interview since the polygraph. During the interview, the defendant indicated that he wanted to speak with a lawyer, and Detective Trentham ended the interview. Before leaving the interview room, Detective Trentham told the defendant, "I hope things work out here, eventually, you know, that -- like I said, I have an opportunity to talk again with an attorney present." Detective Trentham denied that he had planned for a subsequent interview at that point. On April 3, 2012, Detective Trentham obtained a

---

[5] In his motion, the defendant sought suppression of all statements that he made to law enforcement. Because on appeal, however, he argues only that the April 10 interview was unlawful, we will address the facts only as related to that statement.

warrant for the defendant's arrest for the homicide of the victim.

In early April 2012, the defendant was extradited from Colorado to Anderson County, Tennessee, and on April 10, he arrived at the Blount County jail. Before the defendant was arraigned, Detective Trentham met with him, providing him with fresh *Miranda* warnings, and obtaining a signed waiver of rights. Detective Trentham said that the defendant did not indicate at that time that he wished to invoke his right to counsel or to rely on his previous request for counsel. The interview lasted "quite a while."

During cross-examination, Detective Trentham acknowledged that before the interviews in Colorado, the defendant had indicated that he did not want to talk about the Colorado charges. Detective Trentham also acknowledged that he sought to have an officer in Colorado talk to the defendant "before he got in front of a magistrate or judge" and was appointed counsel, explaining, "You try to talk to someone you're trying to get information from before they get placed, because a lot of times once they get an attorney or somebody appointed to them, you have to go through them to be able to speak to that person."

In Colorado, the defendant was housed at the Huerfano County jail, which Detective Trentham described as "very small." Detective Trentham did not know how long the defendant was in Anderson County jail before being transported to Blount County. He said that he ended the interview on September 2 because he understood the defendant to be invoking his right to counsel. In Blount County, the defendant had not yet been assigned a cell when Detective Trentham interviewed him.

The defendant testified that after his arrest in Colorado, he was detained in Huerfano County jail, which he described as having "three little pods with three rooms to it, two beds each. Little-bitty place." The defendant remained at the Huerfano County jail for a "couple of months," during which time his parents, who lived in Knoxville, were not able to visit him, although he spoke to his mother on the phone a "few times." He was told that he could not be released on bond on the Colorado charges because Tennessee "had a hold on me . . . for murder." At some point, the defendant was transferred to the Pueblo County jail in Colorado, which he described as "a big jail." He said that he was placed in confinement by himself "[b]ecause I had murder charges here" and that he remained in isolation until he was extradited to Tennessee. He was transported by van from Colorado to Tennessee by U.S. Prisoner Transport. He "stayed in the back of the van for eight days," handcuffed and shackled and sleeping each night in the van. His handcuffs were removed only "when they stopped at sallyports for me to use the bathroom," but he remained shackled the entire time. The defendant said that the van initially stopped at the Blount County Jail, but "there were news vans in front of the place. So then they got on the phone and they took me to Anderson County."

At the Anderson County jail, the defendant "was placed in isolation and they come in every four hours and place two sets of handcuffs on me and check my room." He estimated that he was in the Anderson County jail for one week before being transported to Blount County, where he was also kept in isolation "[t]he whole time." Before he had seen a judge and even before he had completed being booked into the jail, a detective came to speak with him. The defendant said that he was never placed in the "general prison population" at any of the facilities.

During cross-examination, the defendant said that he did not know specifically how large the Pueblo County jail was because "[t]he isolation floor is all I seen." He said that he was also "isolated from everybody" during the booking process at Pueblo and "was in a holding cell by myself there when they processed me." He acknowledged that he agreed to waive his rights to talk to Agent Crouch. He said that he first told Agent Couch that he wanted an attorney but changed his mind and agreed to talk to Detective Trentham. He said that he waived his rights and talked with Agent Micciche and then Detective Trentham but that "[a]fter they lied to me," he said, "'I think I need a lawyer.'" He denied that the signatures on the waiver of rights forms purported to have been obtained by Agent Crouch on August 26 and Detective Trentham on September 1 were his. After the September 2 interview, he had no further contact with Detective Trentham until April 2012. He acknowledged that he pleaded guilty to one charge in Colorado but said that "they didn't sentence me to nothing. Even though it shows I did 200 days, just because I was fighting extradition."

When asked whether Detective Trentham provided him with *Miranda* warnings before interviewing him in Blount County, the defendant replied, "I'm sure he did." He said that he "guess[ed]" that he waived his rights because "I talked to him."

At the close of the hearing, the trial court found that the defendant had invoked his right to counsel during the interview of September 2, 2011. The court further found that from his arrest in Colorado until December 22, 2011, the defendant was a pretrial detainee and that from December 22, 2011 to March 12, 2012, the defendant was a "post-plea [d]efendant serving a sentence." The trial court denied the defendant's motion to suppress, concluding that the three-month period of post-plea detention, the defendant's access to telephone calls to family, and his access to an attorney during his court appearances on the Colorado charges constituted a sufficient break in custody for the purpose of *Miranda* and "that it was permissible for the detective to reapproach him . . . on April the 10th."

The defendant challenges the trial court's ruling, arguing that the April 10, 2012 statement was obtained in violation of his Fifth Amendment right to counsel. He

-22-

asserts that Detective Trentham initiated the interview despite the defendant's having previously invoked his right to counsel, rendering his statement unconstitutional.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). In *Miranda*, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* To safeguard the privilege against self-incrimination, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity

to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

*Id.* at 473-74.

"[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards v. Arizona*, 451 U.S.477, 484 (1981). Any statement by a defendant elicited by law enforcement after the defendant has invoked his right to counsel is "presumed involuntary and therefore inadmissible as substantive evidence at trial." *State v. Climer*, 400 S.W.3d 537, 558 (Tenn. 2013) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991)). "The *Edwards* presumption of involuntariness continues as long as a suspect remains in custody. The presumption ends "'once the suspect has been out of custody long enough (14 days) to eliminate its coercive effect,' because '[c]onfessions obtained after a 2-week break in custody and a waiver of *Miranda* rights are most unlikely to be compelled.'" *Climer*, 400 S.W.3d at 558 n. 11 (quoting *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010)).

We agree with the trial court that the defendant invoked his right to counsel during the interview on September 2, 2011. The question here is whether the defendant's custody for the purposes of *Miranda* continued unbroken for the seven months between September 2, 2011 and April 10, 2012.

The defendant was arrested on August 25, 2011 in Colorado for unrelated charges and was detained pretrial in the Huerfano County jail. Detective Trentham interviewed him at the jail on September 2, 2011, and the defendant invoked his right to counsel at that time. The defendant entered a guilty plea in his Colorado case on December 22, 2011, and he remained incarcerated in that case pending his sentencing on March 12, 2012, at which time his sentence in the Colorado case was deemed satisfied. From March 12, 2012, until his extradition to Tennessee, the defendant remained incarcerated in Pueblo County for the pending charges in this case. He was transferred to Anderson County in early April 2012 and to Blount County on April 10, 2012, and Detective Trentham initiated an interview that same day.

Although the defendant remained incarcerated for the entire seven months, incarceration alone does not necessarily constitute custody for the purposes of *Miranda*. *See Shatzer*, 559 U.S. at 113. In *Shatzer*, as here, the period of time between the two interviews was one in which the defendant "was not interrogated, but was subject to a

baseline set of restraints." In *Shatzer*, the defendant was serving a prison sentence for prior, unrelated convictions when a detective questioned him about new allegations. *Id.* at 101. The detective ended the interview when the defendant invoked his right to counsel, and the defendant returned to "the general prison population." *Id.* Two-and-a-half years later the detective attempted a second interview. He provided the defendant with *Miranda* warnings, and the defendant signed a written waiver of rights and gave an inculpatory statement. *Id.* The Court stated:

> Interrogated suspects who have previously been convicted of crime live in prison. When they are released back into the general prison population, they return to their accustomed surroundings and daily routine—they regain the degree of control they had over their lives prior to the interrogation. Sentenced prisoners, in contrast to the *Miranda* paradigm, are not isolated with their accusers. They live among other inmates, guards, and workers, and often can receive visitors and communicate with people on the outside by mail or telephone.

> Their detention, moreover, is relatively disconnected from their prior unwillingness to cooperate in an investigation. The former interrogator has no power to increase the duration of incarceration, which was determined at sentencing.

*Id.* at 113-14.

Here, the defendant was a post-conviction inmate during the three months between the entry of his guilty plea and his sentencing hearing in Colorado, during which time, he was not subjected to "the coercive pressures identified in *Miranda*." *See id.* at 113 ("[W]e think lawful imprisonment imposed upon conviction of a crime does not create the coercive pressures identified in *Miranda*."). Although the defendant was never placed in the "general prison population," his detention was, nonetheless, "disconnected from [his] prior unwillingness to cooperate in an investigation," and Detective Trentham had "no power to increase the duration of incarceration." The defendant's continued detention in Colorado did not depend on whether he agreed to speak to Detective Trentham, and the defendant was not transferred to Tennessee until his Colorado case was closed and the sentence satisfied. Moreover, during the April 10 interview, the defendant indicated that he had consulted with a Colorado attorney before his extradition. Because the defendant had access to his family via telephone, had opportunities to consult with counsel, and was serving a sentence in an unrelated case during the seven-month period between the interviews, he was not subject to the "inherently compelling pressures" present in custodial

interrogation. We conclude that there was a sufficient break in his custody for the purposes of *Miranda*, and Detective Trentham was free to initiate the interview on April 10, 2012.

## II. Evidence Rule 404(b)

Next, the defendant contends that the trial court erred by permitting Mr. Hatcher to testify to the defendant's participating in making and detonating bombs in the victim's back yard only days before the fire, arguing that the evidence was inadmissible under Evidence Rule 404(b).

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." Tenn. R. Evid. 404(b). Before such evidence may be admitted, however, the following procedure must be followed:

> (1) The court upon request must hold a hearing outside the jury's presence;

> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

*Id.* When the trial court substantially complies with the procedural requirements of Rule 404(b), this court will overturn the trial court's ruling only when there has been an abuse of discretion. *See State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005); *see also DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). If, however, the strict requirements of the rule are not substantially observed, the reviewing court gives the trial court's decision no deference. *See id.*

On April 8, 2016, the trial court held a hearing to determine the admissibility of Mr. Hatcher's testimony regarding the defendant's participation in bomb-making activities. The court found by clear and convincing evidence that the events described by Mr. Hatcher occurred and that the incident was relevant to the material issue of the cause

of the fire. Finally, the trial court found that the probative value of the evidence was not outweighed by the danger of unfair prejudice.

We conclude that the trial court erred in admitting Mr. Hatcher's testimony about the defendant's bomb-making activities. At the hearing, the State argued that the evidence was "very probative of his guilt as to the arson" and "relevant as to his possession of flammable substances, his knowledge and familiarity of flammable substances, how they work, how to set them off, the use of fuses." The State also argued that the evidence was relevant to show the defendant's motive for and capability to commit the arson. We are unable to see how the defendant's use of explosives a day or two before the fire is probative of his motive for committing arson. In its closing argument at trial, the State argued that because the defendant "knew how to use these types of [explosive] devices" and that his having used "accelerants and explosives shortly before the fire" was evidence of his having committed the charged offenses. The State's only argument at trial about the challenged evidence was that it showed the defendant's propensity to commit the crimes.

On appeal, the State now argues that evidence of the defendant's previously using explosives was relevant to explain the noise that Mr. Fulmer testified to hearing before seeing the fire. Because, however, the State presented no evidence that the fire was started by any kind of explosive device, and, indeed, the cause of the fire was not at issue, the defendant's knowledge of and experience with explosives is not probative of any material issue. Consequently, the trial court abused its discretion by admitting evidence of the defendant's prior use of explosive devices.

We conclude that the erroneous admission of Mr. Hatcher's testimony, however, was harmless. Errors in the admission of evidence "do not normally take on constitutional dimensions," *see State v. Rodriguez*, 254 S.W.3d 361, 375 (Tenn. 2008), and, consequently, constitute reversible error only when they "more probably than not affected the judgment or would result in prejudice to the judicial process," Tenn. R. App. P. 36(b); *Rodriguez*, 254 S.W.3d at 371-72 ("The harmlessness of non-constitutional errors is analyzed using the framework provided by Tenn. R. App. P. 36(b)."). Because the State presented no evidence that the fire was started by an explosive device and, indeed, presented evidence that it was started by an open flame, we do not think that the evidence of the defendant's bomb-making activities more probably than not affected the jury's verdict. Furthermore, the trial court instructed the jury that if they found that the defendant "has committed . . . a bad act, you may not consider such evidence to prove his disposition to commit such a crime as that on trial" and that they could consider such evidence "only for the limited purposes" of completing the "story of the crime"—meaning that "the prior crimes or bad acts and the present alleged crime are logically related or connected or a part of the same transaction" such that "the proof of the other tends or is necessary to prove the one charge or is necessary for a complete account thereof"—or proving the defendant's

-27-

motive or intent.  We presume that the jury followed the instruction of the trial court.  *See State v. Kiser*, 284 S.W.3d 227, 272 (Tenn. 2009) (citing *State v. Banks*, 271 S.W.3d 90, 134 (Tenn. 2008)).

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE